557 Pa. 99 (1999)
731 A.2d 1276
In the Matter of T.R., J.M., C.R., and C.R.
Appeal of A.W.
Supreme Court of Pennsylvania.
Argued April 30, 1997.
Decided June 23, 1999.
*100 Edward Michael Flannery, Philadelphia, for A.W.
Amy Sinden, for Amicus Curiae, C.L.S.
William E. Gibbson, for appellant.
Thomas H. Purl III, Philadelphia, for C.R., Sr.
Vernette Dow, Philadelphia, for D.H.S.
Samuel H. Israel, Philadelphia, for Amicus Curiae.
Donnella R. Shaffer, L. Roy Zipris, Philadelphia, for Amicus Curiae, Child Advocate.
Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

OPINION ANNOUNCING THE JUDGMENT OF THE COURT
FLAHERTY, Chief Justice.
May a court which is adjudicating a juvenile dependency matter order a parent to undergo psychological evaluation and disclose the results of the evaluation to interested parties?
On April 16, 1992 the Philadelphia Department of Human Services (DHS), acting on behalf of T.R., who was ten months old at the time, sought a restraining order, alleging that the child had been admitted to the hospital on two occasions in April of 1992 for eye injuries. The parents were unable to explain the injuries. Another child in the home had previous suffered similar eye injuries, resulting in his being blinded in one eye. The court issued a restraining order and continued the temporary commitment for the child, who remained in foster care. The parents then separated.
On May 17, 1993, the court adjudicated T.R. dependent, discharged the temporary commitment, and placed the child in his mother's custody with DHS supervision. Social workers were assigned to work with the mother in an attempt to *101 improve her ability to be a parent. At a dependency review hearing on April 19, 1994, evidence was introduced that in March of 1994 T.R. suffered a fractured rib. An examination also revealed three previously fractured ribs. Additionally, the child required hospital treatment in 1994 for back bruises. Four children were in the home, and the mother claimed that the two older boys had broken T.R.'s ribs and inflicted his back injuries. As a result of information received at this hearing the trial court ordered the mother to undergo a psychological evaluation to determine whether she was able to care for the children. The mother objected to this examination, but submitted to the evaluation in spite of her objection.
At a hearing on May 12, 1994, DHS requested a restraining order for all four children, alleging that they were at risk of harm while in the mother's care. Prior to adjudicating the request for the restraining order, the court ordered that the psychologist's report be sealed pending the receipt of memoranda of law on the question of whether the court had the power to order the psychological examination. As the hearing continued, a social worker testified that he was concerned for all four of the children in the mother's care, one of whom besides T.R. had suffered a fracture and another of whom suffered an eye injury resulting in blindness in one eye. Another social worker testified that the mother told her that she suffered from migraine headaches. The mother had black eyes from when she blacked out and hit her head. The mother also indicated to the social worker that she was under a lot of stress. At the close of the hearing, the court issued a restraining order temporarily placing all four children in the custody of DHS pending a detention hearing.
On May 13, 1994 a detention hearing was conducted. At this hearing, a social worker testified that two children told him that the mother beat the nine year old and the five year old boys with belts, hair combs, brushes and a plunger, but that T.R., the youngest, was not beaten. Another social worker testified that she had seen black and blue marks on T.R.'s back. The mother told her T.R. had fallen. The social worker also testified that the mother would at times use "time *102 out" as discipline for whole days. In summarizing the evidence, the court stated that the older children had beaten T.R., who had four fractures; that two of the children indicated that the mother beat them with various implements; that the mother had blackouts; that T.R. had eye injuries and that one of his siblings was blind in one eye from injuries; that T.R. had bruises to the lower back; and that the mother did not attend parenting classes. Accordingly, the court temporarily committed the children to DHS pending an adjudicatory hearing.
On July 22, 1994, the court discharged the temporary commitment on T.R. and fully recommitted him to DHS. On July 27, 1994, the court adjudicated the other three children dependent, discharged the temporary commitment, and committed them to the custody of DHS.
On September 29, 1994, the trial court ruled that it had the power to compel a psychological examination of the mother and to release the results of the examination to the parties in order to effect the proper placement of the child and to keep families together. However, at the request of counsel, the court stayed its order for thirty days to allow the mother to appeal the order of a psychological examination.
The mother appealed to Superior Court, which affirmed. Superior Court held that courts must interpret the Juvenile Act broadly to provide for the care, protection, and wholesome mental and physical development of children, and to preserve the family unit where possible. It then determined that the lower court properly exercised its broad discretionary powers in ordering the psychological examination of the mother. Further, Superior Court held that "the psychological evaluation was the least restrictive means to obtain information about appellant's care-taking ability because the other methods of obtaining such information were either limited or failed to provide the necessary information." 665 A.2d at 1267. It also held that "there was no alternative reasonable method of lesser intrusion than the release of appellant's evaluation to the parties because the information obtained from the parenting and disciplinary strategy sessions was inadequate." 665 *103 A.2d at 1268. The Superior Court concluded that there was no violation of Article 1 § 1 of the Pennsylvania Constitution "because the state's compelling interest of protecting T.R.'s future well-being and familial reunification outweighed appellant's privacy intrusion." 665 A.2d at 1268. Thus, Superior Court concluded that the results of the psychological examination were to be released to the parties and that this did not violate the mother's constitutional right to privacy because the information was necessary to carry out the purposes of the act.
The purposes of the Juvenile Act are set out in 42 Pa.C.S. § 6301(b), which provides in pertinent part:
(1) To preserve the unity of the family whenever possible and to provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of the chapter.
* * *
(3) To achieve the foregoing purposes in a family environment whenever possible, separating the child from parents only when necessary for his welfare or in the interest of public safety.
The Juvenile Act concerns proceedings in which a child is alleged to be delinquent or dependent. 42 Pa.C.S. § 6303(a)(1). A dependent child, for purposes of this appeal, is defined by the act as a child who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." 42 Pa.C.S. § 6302.
All four children in this case were adjudicated dependent and this appeal arises only from the trial court's collateral orders as to disposition. Section 6351 of the act concerns disposition:
(a) General rule.  If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the protection and physical, mental, and moral welfare of the child:

*104 (1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.
(2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody to any of the following:
(i) Any individual resident within or without this Commonwealth who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child.
(ii) An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child.
(iii) A public agency authorized by law to receive and provide care for the child.
Section 6339(a) permits the court to require social studies and reports to be made of the child, his family, environment and all matters relevant to disposition of the case. Section 6339(b) provides for physical and mental examinations:
(b) Physical and mental examination and treatment.  During the pendency of any proceeding the court may order the child to be examined at a suitable place by a physician or psychologist and may also order medical or surgical treatment of a child who is suffering from a serious physical condition or illness which in the opinion of a licensed physician requires prompt treatment, even if the parent, guardian, or other custodian has not been given notice of a hearing, is not available, or without good cause informs the court of his refusal to consent to the treatment.
The mother argues that because Section 6339(b) does not provide for the mental examination of the parent, only the child, the legislative intent was not to require mental examinations of parents. Superior Court disagreed, reasoning that the purposes of the act  to provide for the care, protection, and wholesome mental and physical development of children *105 and to preserve the family unit where possible  require that mental examinations of parents be allowed in appropriate cases, for otherwise, the trial court would be without necessary information in making its disposition determination.
In Stenger v. Lehigh Valley Hospital Center, 530 Pa. 426, 609 A.2d 796, 800 (1992), this court stated that there is no longer any question that both the United States Constitution and the Pennsylvania Constitution provide protections for an individual's right of privacy. In Denoncourt v. Commonwealth State Ethics Commission, 504 Pa. 191, 470 A.2d 945, 948 (1983), we quoted Mr. Justice Brandeis:
The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure, and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone  the most comprehensive of rights and the right most valued by civilized men.
The privacy interests which have been recognized are "the individual interest in avoiding disclosure of personal matters, and ... the interest in independence in making certain kinds of important decisions." Stenger, 609 A.2d at 800. Related to these interests is the right to be let alone. Id. at 801. This case implicates both the mother's interest in avoiding disclosure of personal matters and her right to be let alone.
In In Re June 1979 Allegheny County Investigating Grand Jury, 490 Pa. 143, 415 A.2d 73,77 (1980) we identified the source of the privacy interest in avoiding disclosure of personal matters as Article 1, Section 1 of the Pennsylvania Constitution:
All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, *106 possessing and protecting property and reputation, and of pursuing their own happiness.
We decide this case pursuant to Article 1 Section 1 of the Pennsylvania Constitution.
Although the right to privacy is of constitutional dimension, it is not unqualified. Privacy claims must be balanced against state interests. Our test of whether an individual may be compelled to disclose private matters, as we stated it in Denoncourt, is that "government's intrusion into a person's private affairs is constitutionally justified when the government interest is significant and there is no alternate reasonable method of lesser intrusiveness to accomplish the governmental purpose." 470 A.2d at 949. More recently, we have stated the test in terms of whether there is a compelling state interest. Stenger, 609 A.2d at 802. In reality, the two tests are not distinct. There must be both a compelling, i.e., "significant" state interest and no alternate reasonable method of lesser intrusiveness.
In In Re B, 482 Pa. 471, 394 A.2d 419 (1978) this court addressed a problem similar to that posed by this case. The issue there was whether the trial court in the context of a disposition hearing in a juvenile delinquency proceeding could compel the release of the mother's psychiatric records in order to determine the proper placement of the juvenile. The mother's psychiatrist refused to release the mother's medical records in the absence of her consent and the lower court held the psychiatrist in contempt. We reversed, holding that the mother's right of privacy precluded the release of psychiatric records in this context. This court specifically recognized "that our holding may, in some cases, make it more difficult for the court to obtain all the information it might desire regarding members of the juvenile's family, or about the juvenile's friends, neighbors, and associates. The individual's right of privacy, however, must prevail in this situation." 394 A.2d at 426.
In In Re B and in the present case, what is at stake is access to psychiatric records. One's interest in not being *107 forced to disclose such records is significant. The right to protect one's beliefs and thoughts from intrusion by others is, to paraphrase Mr. Justice Brandeis, one of the most comprehensive rights known to civilized men. The Supreme court of California has stated: "If there is a quintessential zone of human privacy, it is the mind. Our ability to exclude others from our mental process is intrinsic to the human personality." Long Beach City Employees Assoc. v. City of Long Beach, 41 Cal.3d 937, 227 Cal.Rptr. 90, 719 P.2d 660, 663 (1986)(striking as unconstitutional legislation requiring certain public employees to undergo polygraph examinations).
Set against this interest of the mother is the interest of the state in discovering enough information about the children and their parents to make intelligent decisions about the placement of the children. Superior Court's view is that "the psychological evaluation was the least restrictive means to obtain information about appellant's caretaking ability because the other methods of obtaining such information were either limited or failed to provide the necessary information." 665 A.2d at 1267.
The Department of Human Services, echoing the view of the Superior Court that existing information was insufficient, states:
Both the professionals assigned to appellant's household were to learn about the family's problems and help appellant provide appropriate care to her children. Despite their insistence, appellant had not learned appropriate parenting skills or disciplinary techniques. Additionally, T.R. continued to be injured although services were provided to appellant's home; T.R.'s siblings also stated that they were beaten by appellant although appellant denied beating them; and, appellant said she was under stress and had no one to care for her children.
Thus, means less intrusive had failed. Accordingly, there was no other means less intrusive to accomplish the governmental objectives of keeping the family together and of separating them only when necessary to protect the children *108 than to request appellant to submit to a psychological evaluation.
Appellees' brief at 13.
We disagree that means less intrusive were not available. The Department of Human Services argues  correctly  that there was something terribly wrong with the mother's ability to parent. The children continued to be injured even though the department had attempted to assist the mother in caring for her children. Further, the department also points out that its attempts to assist the mother "had failed." In short, even the department agrees that there is an abundance of information in the case about whether the children are being cared for properly and whether the mother is a fit parent.
The real issue in the case, then, is not so much whether the children should be removed, as whether the mother should be protected from her own assertion of a constitutional right because the assertion of that right may impede the efforts of the courts to return the children to her care. Citing the legislative goal of keeping the family together, the department would require the psychological examination.
We regard such a concern as well intentioned, but misplaced. Compelling a psychological examination in this context is nothing more or less than social engineering in derogation of constitutional rights, and where, as here, there is an abundance of information about the ability of the parent to be a parent, there is no state interest, much less a compelling state interest, in the ordering of parental psychological examinations. In fact, we find such state intervention frightening in its Orwellian aspect. It is one thing for the mother to agree to psychological evaluation and to voluntarily undergo instruction in self-improvement, but it is quite another for the state, in the exercise of paternalistic might, to order a psychological evaluation in violation of the mother's constitutional rights, presumably upon pain of imprisonment for contempt of court. The constitution is not a mere policy statement to be overridden by a sociological scheme for the improvement of society. The mother, alas, may be her own worst enemy and her *109 shortcomings as a parent may result in the permanent removal of her children; nonetheless, the mother remains a free person, and her power to assert her constitutional right to privacy is not diminished merely because the representatives of the state think it is ill advised.
In holding that the mother should be compelled to undergo a psychiatric examination the results of which are to be released to the parties, Superior Court not only ignored the holding in In Re B,[1] which we find indistinguishable from the present case, but also elevated the interests of the state beyond all reasonable limits.[2] We conclude, as we did in In Re B, that there is no governmental interest sufficient to negate the mother's assertion of her right of privacy.
The order of Superior Court is reversed.
Justice NIGRO files a concurring opinion.
Justice ZAPPALA concurs in the result.
Justice NEWMAN files a dissenting opinion joined by Justice CASTILLE.
NIGRO, Justice, concurring.
I agree with the majority that, under the circumstances of this case, the trial court erred in ordering A.W., the mother of *110 T.R., J.M., C.R. and C.R., to involuntarily submit to a psychological evaluation. I write separately, however, to note that once a parent refuses to submit to a psychological evaluation, as A.W. did here, the trial court should be entitled to draw a negative inference from that refusal when determining the appropriate placement of the child. See 42 Pa.C.S. § 6351.
NEWMAN, Justice, dissenting.
Today we consider a landmark issue concerning a parent's right to privacy where there is strong evidence that the parent has abused his or her own child. The issue is whether a trial court, while performing a juvenile dependency disposition review because of a showing that a parent has abused or neglected a child, may order the parent to undergo a psychological evaluation and disclose the results of the evaluation to interested parties.[1] After carefully balancing the specific interests in this case, it is clear to me that the trial court had the inherent authority to compel the psychological examination of A.W. to create the most accurate assessment of her ability to care for her young children and prevent their future abuse and possible death. Further, an in camera review of the evaluation would protect the privacy interest of A.W., while still providing the trial court a concrete assessment of the parenting abilities of A.W.
I recognize that a fundamental right to privacy emanates from the Pennsylvania Constitution Article 1, § 1 and other sections of the Pennsylvania Constitution. In re B, 482 Pa. 471, 394 A.2d 419 (1978). Specifically, in Denoncourt v. Commonwealth of Pennsylvania, State Ethics Comm'n, 504 Pa. 191, 470 A.2d 945 (1983), this Court explained that the privacy interest pursuant to Article I, Section 1 involves a freedom from disclosure of personal matters. However, we also acknowledged that not every intrusion into an individual's privacy is unconstitutional. Denoncourt. To determine whether a *111 particular intrusion is impermissible, this Court must analyze each case individually and carefully balance an individual's right to privacy against the countervailing state interest warranting the intrusion. Id. As we stated in Denoncourt, "the government's intrusion into a person's private affairs is constitutionally justified when the government interest is significant and there is no alternate reasonable method of lesser intrusiveness to accomplish the governmental purpose." Id. at 199-200, 470 A.2d at 949.
Here, the Commonwealth's interest is easily identifiable and clearly significant: to provide for the safety and welfare of its children who have been adjudicated dependent. See 42 Pa. C.S. § 6301. The Commonwealth's role as the protector of children is the "hallmark of a humane individual and of a civilized state." In re William L., 477 Pa. 322, 338, 383 A.2d 1228, 1236 (1978)(quoting Commonwealth ex rel. Children's Aid Society v. Gard, 362 Pa. 85, 99, 66 A.2d 300, 307 (1949)). By removing the child from his family, the government has assumed an awesome responsibility and it should be exacting and exhaustive in its investigation of the proper placement for the child. This decision-making process is critical because a placement error can result in the grave injury, if not the death, of the dependent child.
To prevent a tragic outcome, a trial court must attempt to find the reason why a parent cannot protect the child from injuries or why the parent is injuring the child. All of these issues must be explored and addressed in an effort to reunite the family. In many situations, the current psychological condition of the parent can be critical to deciding the source of the problems that originally brought the family to the attention of DHS. The life of a child may be saved by an expert's ability to interpret sophisticated psychological nuances. Thus, there is a significant government interest in obtaining a psychological evaluation of the parent. Denoncourt.
The countervailing interest in this case is A.W.'s right to privacy in her own mind and thoughts. Whalen v. Roe, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). While the Majority analogizes her situation with that of In re "B", I find *112 it distinguishable. First, the facts of In re "B" required that the trial court consider whether a delinquent child should serve his sentence. Here the question is whether a child who has suffered serious physical injury in her mother's care should be returned to the mother's care. Clearly, the Commonwealth's interest in comprehending A.W.'s current mental and psychological state is more relevant here. Second, the issue in In re "B", disclosure or a mother's psychiatric history, is distinct from the instant case, which concerns a court-ordered psychological evaluation to assess a mother's fitness to regain physical custody of her dependent children. The nature of the information revealed, and therefore the privacy interest infringed, is different.
In In re "B", the Court noted that production of an entire psychiatric history infringes on the patient's "most intimate emotions, fears, and fantasies." Id. at 485, 394 A.2d at 425. Here, however, the trial court did not compel an exhaustive review of A.W.'s psychiatric history or require an extensive investigation into her intimate emotions, fears and fantasies; instead, it ordered a "targeted" psychological evaluation to garner an expert opinion on A.W.'s current mental status and ability to control her children and to protect them from harm.
The Commonwealth's interest in knowing the parent's current mental status, particularly where past neglect and abuse have led to repeated physical injury, outweighs the parent's privacy interest. In these cases, we should turn to an expert for advice concerning the psychological state of the parent. Here, A.W. has been involved with DHS for more than ten years and the children continue to suffer physical injuries including blindness in one eye, fractured ribs and back bruises, and a spinal fracture. These injuries are a result of her neglect and possible abuse and yet, A.W. seeks to regain custody of her children although she has refused to attend parenting classes or learn appropriate disciplinary techniques.[2] *113 A psychological examination is an important means to discover why, despite the best efforts of caseworkers, A.W. has been resistant and refuses to learn proper parenting skills. This psychological information may, in turn, lead to the most appropriate physical and legal disposition of the children. The state's interest in caring for the safety and welfare of her children outweighs A.W.'s privacy interest.
Moreover, in my opinion, the Juvenile Act implicitly provides for the trial court to order a psychological evaluation. Although the Juvenile Act does not expressly authorize a trial court to order a psychological evaluation of a dependent child's parent, such an order is consistent with the purpose of the Juvenile Act, which promotes that the placement of custody must be in the best interests of the child.[3] An examination of the language of various provisions of the Juvenile Act reinforces this conclusion. First, the Juvenile Act permits broad discretion in the admission of evidence pertaining to a placement that will be in the child's best interests. Section 6341(d) allows that admission of "all evidence helpful in determining the questions presented," including oral and written reports, during a disposition review hearing. 42 Pa.C.S. § 6341(d). It then goes on to state that the trial court can rely on the reports to the extent that the information is relevant. Id. After the child is adjudicated dependent, Section 6341(e) permits the trial court to continue to conduct hearings and receive reports and other evidence bearing on the disposition of the child's need for treatment, supervision or rehabilitation.
Second, the language of the Act in Section 6339(a) explicitly authorizes the trial court to investigate a family member and *114 does not expressly limit that investigation. Section 6339(a) reads, in part, as follows:
(a) General rule.  If the allegations of a petition are admitted by a party or notice of hearing under section 6355 (relating to transfer to criminal proceedings) had been given, the court, prior to the hearing on need for treatment or disposition, may direct that a social study and report in writing to the court be made by an officer of the court or other persons designated by the court, concerning the child, his family, his environment, and other matters relevant to disposition of the case.

42 Pa.C.S. § 6339(a)(emphasis added). There is no section governing or expressly limiting the investigation of a parent. Therefore, to achieve the best interests of the child, I believe that that the General Assembly implicitly provided the trial court with the authority to order a psychological evaluation of a dependent child's mother in a dependency proceeding.
The General Assembly has given the Commonwealth broad powers to make decisions regarding the welfare of a dependent child including, most important, the power to determine the child's living arrangements. 42 Pa.C.S. § 6351. Section 6351 provides as follows:
§ 6351. Disposition of dependent child
(a) General rule.  If the child is found to be a dependent child the court may make any one of the following orders of disposition best suited to the protection and physical, mental, and moral welfare of the child:
(1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.
(2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody to any of the following:
(i) Any individual resident within or without this Commonwealth who, after study by the probation officer or other person or agency designated by the court, is *115 found by the court to be qualified to receive and care for the child.
(ii) An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child.
(iii) A public agency authorized by law to receive and provide care for the child.
42 Pa.C.S. § 6351.
To assist in the determination of proper physical custody, Section 6339(a) authorizes the trial court to order an "officer of the court or other person designated by the court" to conduct an investigation of the child, the child's family, his or her environment, and other relevant matters. 42 Pa.C.S. § 6339(a). Although Section 6339(b) provides authority for the trial court to order physical and mental examinations and treatment of a child, there is no section of the Juvenile Act that explicitly provides for the physical or psychological examination of a parent in the context of a disposition review hearing. When interpreting a statutory scheme involving children, our decisions are guided by the polestar of effectuating the best interests of the child. E.g., Robinson v. Robinson, 538 Pa. 52, 645 A.2d 836 (1994)(the standard in custody proceedings is best interests of the child); Oeler v. Oeler, 527 Pa. 532, 594 A.2d 649 (1991)(purpose of child support is to promote best interests of child); Change of Name of Zachary Thomas Andrew Grimes, 530 Pa. 388, 609 A.2d 158 (1992)(change of name must be in best interests of child); School District of Wilkinsburg v. Wilkinsburg Education Ass'n, 542 Pa. 335, 667 A.2d 5 (1995)(guiding principle for examining problems with public education is the best interests of the children). This universal legal axiom, the best interests of the child, is implicit in the statement of purpose of the Juvenile Act and informs our interpretation of it. Hence, the statutory interpretation that "will encourage, rather than discourage, action related to the best interests and protection of the child, is preferred." In re Lowry, 506 Pa. 121, 130-31, 484 A.2d 383, 388 (1984). It is in the best interests of a child to live with an adult mentally capable of caring for the child and, *116 as discussed later, in certain situations, the mental stability of a parent can only be determined through a psychological examination.
Additionally, I find persuasive Rule 1915.8 of the Rules of Civil Procedure authorizing the physical and mental examination of a child or a party to a child custody dispute, including a parent. Rule 1915.8(a) provides as follows:
RULE 1915.8 PHYSICAL AND MENTAL EXAMINATION OF PERSONS
(a) The court may order the child or a party to submit to an evaluation by an appropriate expert or experts. The order may be made upon the court's own motion or on motion of a party with reasonable notice to the person to be examined, and shall specify the place, manner, conditions and scope of the examination and the person or persons by whom it is to be made.
The Comment to Rule 1915.8 notes that the trial court, when making a child custody decision in the best interests of the child, "often requires information that can only be supplied by an expert evaluation of the parties and the subject child." Similarly, to make an informed disposition in the best interests of the child, the Juvenile Act must accordingly permit the trial court to order a psychological examination to determine the mental status of a parent.
I further believe that the distribution of the report of A.W.'s psychological evaluation to the interested parties does not violate A.W.'s privacy rights pursuant to Article I, Section 1 of the Pennsylvania Constitution. The Commonwealth has a most important interest to determine the proper physical custody arrangement for a dependent child and to be certain to prevent placement of the child with an adult that is incapable to care for the child and can cause injury to the child. See 42 Pa.C.S. § 6301(b)(1). After an in camera review of the report, the information should be given only to the parties of interest who are enumerated in the Juvenile Act, which provides sufficient safeguards to protect A.W.'s privacy interests. E.g., In re June 1979 Allegheny County Investigating Grand *117 Jury, 490 Pa. 143, 415 A.2d 73 (1980)(limited disclosure of tissue reports to grand jury and supervising judge sufficiently protects the patient's privacy interests); see also Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)(due process permits a defendant to have a trial court conduct in camera review of Children's and Youth Services files of a child accuser to determine if there is information "material" to his defense). Here, by requiring an in camera review by the ultimate arbiter, the Commonwealth's interest in making the most informed custody placement will be achieved without disclosure of irrelevant private information.
Section 6307 of the Juvenile Act guides this distribution, which permits the limited disclosure of any file or record of the court to certain persons and entities. 42 Pa.C.S. § 6307. Section 6307 provides as follows:
All files and records of the court in a proceeding under this chapter are open to inspection only by:
(1) The judges, officers and professional staff of the court.
(2) The parties to the proceeding and their counsel and representatives, but the persons in this category shall not be permitted to see reports revealing the names of confidential sources of information contained in social reports, except at the discretion of the court.
(3) A public or private agency or institution providing supervision or having custody of the child under order of the court.
(4) A court and its probation and other officials or professional staff and the attorney for the defendant for use in preparing a presentence report in a criminal case in which the defendant is convicted and who prior thereto had been a party to a proceeding under this chapter.
(5) The Administrative Office of Pennsylvania Courts.
(6) With leave of court, any other person or agency institution having a legitimate interest in the proceedings or in the work of the unified judicial system.
42 Pa.C.S. § 6307. The General Assembly has considered the privacy concerns of individuals involved in proceedings pursuant to the Juvenile Act and explicitly limited disclosure to the *118 parties set forth in the Act. The limitations in Section 6307 promote the Commonwealth's goal of making the most informed placement decision, but are narrowly tailored to prevent any significant violation of a parent's privacy. I believe that there is no less intrusive method to achieve the Commonwealth's compelling interest. The psychological evaluation is only permitted in situations where the trial court concludes that routine observation and assessment methods fail to describe accurately the parent's psychological problems, and the children continue to suffer physical injury. The psychological evaluation is then reviewed in camera to enable the trial judge to make the educated determination of its relevance and its ability to change untenable situations. The psychological evaluation will then only be distributed to those parties that the General Assembly, pursuant to Section 6307, deemed appropriate to review the evaluation.
Because I find that the trial court properly ordered a psychological evaluation of A.W., I respectfully dissent. For the foregoing reasons, I conclude that the Juvenile Act authorizes the order of the trial court compelling A.W. to submit to a psychological evaluation.
Justice CASTILLE joins this Dissenting Opinion.
NOTES
[1] Inexplicably, Superior Court's only reference to In Re B was to cite it as part of a quotation from another case. The trial court and the appellee attempt to distinguish In Re B by observing that in that case, the mother's medical records were already extant, whereas in this case, there were no records. We regard this as a distinction without a difference. In either case, the mother's innermost thoughts and feelings were sought to be discovered against her will.
[2] In addition to elevating the interests of the state beyond reasonable limits, the lower courts also ignored the requirement of Denoncourt and Stenger that in order to be valid, a state intrusion on a privacy interest must, at the very least, effect the state's purpose. Stenger, 609 A.2d at 802, quoting Denoncourt. We are not convinced that there is more than speculation that the psychological evaluation ordered by the trial court would meaningfully advance the court's ability to place the children appropriately, for the value and the accuracy of a coerced psychological examination is inherently suspect. In the usual case,, more information is better than less, but not when there is the assertion of a constitutional privilege against the gathering and release of such information and when its usefulness is, at best, uncertain.
[1] This case does not involve any psychotherapist/patient privilege and concerns only the civil constitutional right to privacy. Therefore, any discussion of criminal constitutional rights, such as the right against self-incrimination or the right to confront witnesses, is beyond the scope of the issues in this case.
[2] The state is required to work in concert with the parent to correct problems that have led to child abuse and if the parent does not cooperate, termination of parental rights is a very real possibility. Matter of Welfare of S.A.V., 392 N.W.2d 260 (Minn.App. 1986), disapproved by In re Welfare of J.W., 415 N.W.2d 879 (Minn. 1987).
[3] One purpose of the Act is for the "care, protection, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1). Children who are adjudicated dependent fall within the provisions of the Juvenile Act. 42 Pa.C.S. § 6306(a)(1). A "dependent" child is one "without proper parental care or control, subsistence, education ..., or other care or control necessary for his physical, mental, or emotional health, or morals[.]" 42 Pa.C.S. § 6302.