J-A27030-14

2014 PA Super 229

IN RE: D.S., A MINOR                      :        IN THE SUPERIOR COURT OF
                                          :                PENNSYLVANIA
                                          :
APPEAL OF: T.S., FATHER                   :        No. 577 WDA 2014


Appeal from the Order Entered March 12, 2014,
In the Court of Common Pleas of Allegheny County,
Civil Division, at No. 99-1597.


BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN and MUSMANNO, JJ.

OPINION BY SHOGAN, J.:                             **FILED  OCTOBER 10, 2014**

In this dependency case, T.S. ("Father") appeals from the order entered on March 12, 2014, that, *inter alia*, directed Father to undergo a psychiatric evaluation and changed the placement of his minor child ("D.S.").[1]  After careful review, we reverse in part and affirm in part.

The trial court set forth the relevant facts and procedural history of this matter as follows:

> The family has an extensive history with Allegheny County Child Youth and Families (CYF) dating back to 2000. Both D.S. and [a sibling] Z.S. were removed from Mother's care for suspected neglect and physical abuse.[2] They were eventually returned to her care. The children were removed from Mother's care in 2002 for similar allegations. Father was granted primary physical custody of the children in Adult Family Division. Mother was allowed unsupervised contact with the children through this

---

[1] Because the order changed D.S.'s placement, it is a final appealable order. **See In re C.M.**, 882 A.2d 507, 512 (Pa. Super. 2005) (explaining that in a dependency case, an order granting or denying a status change, as well as an order terminating or preserving parental rights, shall be deemed final when entered).

[2] Neither Z.S. nor the children's mother is a party to the instant appeal.

order. The family came to the attention of CYF again in 2009 when Mother requested removal of the children. It was reported that Father had placed the children in Mother's care sometime in 2008. CYF filed a Dependency Petition but the case was closed after Father agreed to assume custody of the children.

On September 27, 2013, Father filed a Private Dependency Petition alleging that D.S. was running away and refusing to follow household rules.[2] At a Shelter Hearing[3] on October 10, 2013, [F]ather requested that the children be removed from his home. Sometime prior to entering the courtroom for this hearing, the caseworker observed the children, in the hall, begging Father to return home. The caseworker testified that [F]ather responded by pushing the children off of him and saying "get the f*** off of me".

[2] A similar petition was filed for Z.S.

[3] The Honorable William Ward was presiding over the case until December 31st, 2013.

At a review hearing on November 12, 2013, the court allowed D.S. to return home to [F]ather. Father subsequently demanded the child be removed from his home again on December 5, 2013. On December 18, 2013, D.S. was adjudicated dependent under 42 Pa.C.S. §6302(1) and (6). Father stipulated that he required CYF's assistance in meeting D.S.'s mental health needs. At this hearing, the court offered Father home visits on Christmas Eve and Christmas day. Father declined both of the visits. The court further ordered that D.S., Father and Father's paramour[4] attend [Allegheny Forensic Associates] (AFA) evaluations. D.S. did attend her individual evaluation but Father and his paramour refused to attend their individual evaluations with Dr. Rosenblum.

[4] It should be noted that Father's live-in paramour was the former CYF caseworker assigned to the family case. This was a point of contention in the family and thus the reason for ordering her to participate in the evaluations.

The parties appeared before the Court on March 12, 2014 for a Permanency Review Hearing. Prior to this hearing, counsel for all parties briefed the issue of parent's right to refuse an individual AFA evaluation. The caseworker, Father, and D.S. testified, and reports from Dr. Rosenblum and Dr. Vallano were admitted into evidence[5]. Dr. Rosenblum completed an interactional evaluation of D.S., Z.S., [Father] and [F]ather's paramour. Dr. Rosenblum opined that D.S. grew up in a "highly dysfunctional and unstable family. Father has his hands full with these children for quite some time. Of course the fact that he has run through a number of different girlfriends has not helped... this Psychologist continues to believe it would be advantageous to complete evaluations with father...[.] I believe the parents need help in identifying increased structure and specific behavioral expectations for D.S...[.]" Dr. Vallano completed an individual evaluation of D.S. and similarly determined that intensive family therapy would be beneficial to the family. Dr. Vallano recommended "Family therapy to work with father to help him better understand the trauma and trauma impact as well as parent behavioral management training on how to oversee an adolescent with significant emotional and behavioral difficulties".

[5] The Court considered this evidence as well as the briefs from the parties.

D.S. also provided testimony that [F]ather had not been visiting the placement facility and was not permitting her to have home visits. Specifically, she testified, "We have been down this road. "Yeah I'm willing", but he just says it. He never does it. It is always my fault. Everything is always my fault." Most importantly, D.S. expressed her desire for love and affection and longing for a home which could provide her with both. The court found D.S.'s testimony both credible and compelling. It was apparent that she longed for a better relationship with her father and appeared willing to engage in services.

Father wavered in his responses; at times he agreed to cooperate with services and at other times he expressed that services would not work for D.S. After direct examination and cross, the court questioned Father about the doctor's recommendations for individual therapy. Father testified that either family therapy or individual therapy "couldn't hurt". He

later testified that he was willing to accept the services that Dr. Rosenblum recommended in his report. When asked whether he would cooperate with any services in order to keep the children at home he replied, "Yes, I am willing to keep trying".

Despite these responses, [F]ather's counsel expressed to the Court that his client did not wish to be evaluated by Dr. Rosenblum because it was "a one shot deal" and "not therapy". While counsel did state this in his closing argument, the court took Father's testimony as [a] whole to be that he was willing to cooperate with any services that would allow for the return of his daughter. While [F]ather's counsel opined that was not what Father meant, it is clear by his responses that Father agreed to engage in individual therapy. There had been no suggestions by any of the parties that Father was in need of individual therapy only. The purpose in litigating and briefing this issue was whether it was in the best interest of D.S. to evaluate Father's mental health needs with respect to his parenting abilities.

CONCLUSION:

While Father does not believe he needs to be evaluated by a mental health professional, the Court believes that he does. D.S. has been through a number of traumatic and disturbing incidents in her life. Father lacks any insight about how to address D.S.'s mental and emotional problems. The existence of a romantic relationship between [F]ather and the former caseworker is also particularly troubling. This type of poor decision making and parenting exhibits a clear need for Father to obtain some type of mental health services of his own. He has had a number of paramours in the home which has also created tension. Father appears willing to participate in services that he believes to be appropriate. He demands CYF to remove the child but is unwilling to actually cooperate with services. Father's refusal to undergo an individual evaluation is troubling because of the nature and severity of D.S.'s history of trauma and abuse. The goal in this case has always been reunification. In order to facilitate such a goal, it is vital to the family to address everyone's mental health needs as well as to minimize conflict in the home.

Trial Court Opinion, 5/15/14, at unnumbered 1-5 (bracketed footnote added).

Following the hearing, the trial court ordered D.S. to be moved to a placement facility that could address her mental health issues, and where she could undergo trauma-based therapy, family therapy, and individual therapy. Order, 3/12/14. The trial court also directed Father to attend an individual psychiatric evaluation at AFA and directed him to follow the recommendations made as a result of the AFA evaluation. *Id*. Father filed a timely appeal.

On appeal, Father presents a single issue for this Court's consideration:

> Did the Trial Court abuse its discretion by not applying the law and making a decision that was manifestly unreasonable by ordering [Father] to participate in a mental health evaluation despite no record of a mental health deficiency to establish the compelling state interest needed to justify the intrusion upon his Constitutionally protected right to privacy?

Father's Brief at 4.

Initially, we point out that our standard of review of an order changing the placement of a dependent child is for an abuse of discretion. *In re A.K.*, 936 A.2d 528, 532-533 (Pa. Super. 2007) (citation omitted). However, because the salient issue in this matter is whether the trial court could order Father to undergo a psychiatric evaluation, we analyze this issue pursuant to Article 1 Section 1 of the Pennsylvania Constitution. *See In re T.R.*, 731

A.2d 1276, 1280 (Pa. 1999) (plurality decision) (citing **Denoncourt v. Commonwealth State Ethics Commission**, 470 A.2d 945, 949 (Pa. 1983)). Article 1 Section 1 provides as follows:

> **Inherent rights of mankind**
>
> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

Pa. Const. Art. 1, § 1. However:

> Although the right to privacy is of constitutional dimension, it is not unqualified. Privacy claims must be balanced against state interests. Our test of whether an individual may be compelled to disclose private matters, as we stated it in **Denoncourt**, is that "government's intrusion into a person's private affairs is constitutionally justified when the government interest is significant and there is no alternate reasonable method of lesser intrusiveness to accomplish the governmental purpose." [**Id**.] at 949. More recently, we have stated the test in terms of whether there is a compelling state interest. **Stenger** [**v. Lehigh Valley Hospital Center**, 609 A.2d 796, 802 (Pa. 1992)]. In reality, the two tests are not distinct. There must be both a compelling, *i.e.*, "significant" state interest and no alternate reasonable method of lesser intrusiveness.

**In re T.R.**, 731 A.2d at 1280.

Applying this analysis, our Supreme Court then held in **In re T.R.** that the mother's right to privacy precluded a compelled psychological evaluation. **In re T.R.**, 731 A.2d at 1281. The Court concluded that there was abundant information already in the case about the mother's parenting ability, or lack thereof. **Id**.

Here, Father argues that the trial court misapplied the law when it ordered him to undergo a psychiatric evaluation. Father's Brief at 10. Father cites *In re K.D.*, 744 A.2d 760 (Pa. Super. 1999) as support for his position. In that case, a panel of this Court stated:

> The Juvenile Act does not expressly provide for a parent to submit to a psychological evaluation during a dependency proceeding. Moreover, the purposes of the Act are:
>
> > (1) To preserve the unity of the family wherever possible or to provide another alternative permanent family when the unity of the family cannot be maintained.
> >
> > (1.1) To provide for the care, protection, safety and wholesome mental and physical development of children coming within the provisions of this chapter. ...
> >
> > (3) To achieve the foregoing purposes in a family environment whenever possible, separating the child from parents only when necessary for his welfare, safety or health or in the interests of public safety.
> >
> > (4) To provide means through which the provisions of this chapter are executed and enforced and in which the parties are assured a fair hearing and their constitutional and other legal rights recognized and enforced.
>
> 42 Pa.C.S.A. § 6301(b).

*In re K.D.*, 744 A.2d at 761. The panel then went on to state:

> We believe, under the circumstances of this case, that the best interests of the children can be maintained without compelling appellant to submit to a psychological evaluation. Our

thorough evaluation of the trial court opinion and the record reveals a noticeable lack of support for subjecting appellant to this evaluation. A mere allegation that appellant has been taking medication for a mental condition and passed out on one occasion as a result of the medication is insufficient, in our minds, to force upon her an unwanted psychological evaluation.

*Id*.

Similarly, in the present case, while there remains no absolute bar to ordering a psychiatric evaluation, we conclude that the trial court's order of a mandatory psychiatric evaluation and treatment was not the least invasive means of achieving its well-intentioned goal. In a case where this Court examined the decision in *In re T.R.*, we stated: "[*In re*] *T.R.* stands for the proposition that the court may not, under certain circumstances, invade an individual's privacy rights by ordering a psychological evaluation and revealing its results; **however**, the court may take into consideration a parent's refusal to follow its treatment **recommendation**." *In re J.Y.*, 754 A.2d 5, 9 (Pa. Super. 2000) (emphasis added).

Here, there would have been no impediment to the trial court's **recommendation** that Father seek treatment, and if Father opted to forgo that treatment, his refusal could have been considered by the trial court in D.S.'s placement. *In re J.Y.*, 754 A.2d at 9. However, we cannot conclude that there was a compelling state interest in **ordering** the evaluation and directing Father to comply with recommendations made by AFA in this case.

Indeed, there were no specific allegations or evidence of record that Father

had any particular mental health deficiencies.

As pointed out by the Court in **In re T.R.**:

The real issue in the case, then, is not so much whether the children should be removed, as whether the mother should be protected from her own assertion of a constitutional right because the assertion of that right may impede the efforts of the courts to return the children to her care. Citing the legislative goal of keeping the family together, the department would require the psychological examination.

We regard such a concern as well intentioned, but misplaced. Compelling a psychological examination in this context is nothing more or less than social engineering in derogation of constitutional rights, and where, as here, there is an abundance of information about the ability of the parent to be a parent, there is no state interest, much less a compelling state interest, in the ordering of parental psychological examinations. In fact, we find such state intervention frightening in its Orwellian aspect. It is one thing for the mother to agree to psychological evaluation and to voluntarily undergo instruction in self-improvement, but it is quite another for the state, in the exercise of paternalistic might, to order a psychological evaluation in violation of the mother's constitutional rights, presumably upon pain of imprisonment for contempt of court. The constitution is not a mere policy statement to be overridden by a sociological scheme for the improvement of society. The mother, alas, may be her own worst enemy and her shortcomings as a parent may result in the permanent removal of her children; nonetheless, the mother remains a free person, and her power to assert her constitutional right to privacy is not diminished merely because the representatives of the state think it is ill advised.

**In re T.R.**, 731 A.2d at 1281.

Likewise, while Father himself may be an impediment to reunification

with D.S., we cannot conclude that there is a state interest in this matter

that is so compelling that Father's constitutional rights may be overridden. Here, it was Father, not a government agency, who filed the dependency petition requesting that D.S. be removed from his home.[3] If Father is unwilling to voluntarily seek psychiatric treatment and follow recommendations, that remains his choice, as he initiated the underling petition. However, the trial court is under no obligation to reunite D.S. with a parent or guardian unable or unwilling to care for her. A court order directing psychiatric treatment in violation of Father's constitutional rights, with the possible penalty for failure to comply being "imprisonment for contempt of court,"[4] is not warranted under the facts of this case or the aforementioned relevant legal authority.

For these reasons, we conclude that the trial court erred in ordering Father to undergo a psychiatric evaluation. Accordingly, that part of the March 12, 2014 order directing Father to undergo a psychiatric evaluation and follow AFA recommendations is hereby reversed. The order is affirmed in all other respects.

---

[3] Appellee, Kids Voice, as Guardian *ad litem* for D.S., emphasizes that a psychiatric evaluation was warranted because Father filed the dependency petition and invited the government intervention. Appellee's (Guardian *ad litem*) Brief at 13. We disagree. If Father will not voluntarily undergo a mental health evaluation, we doubt that a court order compromising his constitutional rights will cure the underlying issues in this matter.

[4] *In re K.D.*, 744 A.2d at 761 (quoting *In re T.R.*, 731 A.2d at 1281).

Order reversed in part and affirmed in part.  Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/10/2014