J-S10029-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: J.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: G.S., FATHER | No. 2582 EDA 2014 |

Appeal from the Order entered July 22, 2014,
in the Court of Common Pleas of Philadelphia County, Family
Court, at No: CP-51-DP-0001440-2014

BEFORE:  GANTMAN, P.J., STABILE, and PLATT*, JJ.

CONCURRING AND DISSENTING MEMORANDUM BY STABILE, J.: **FILED JUNE 22, 2015**

I agree with the Majority that the trial court did not abuse its discretion in adjudicating Child dependent pursuant to 42 Pa.C.S.A. § 6302, and in removing her from Father's home and committing her to DHS. Further, I agree with the Majority that the trial court had authority under 42 Pa.C.S.A. § 6339(b) to permit DHS to consent to medical care and mental health treatment for Child, and that Father's issue regarding whether the trial court must order an interstate compact for Arkansas is moot.  However, because I cannot conclude that there is a compelling state interest in ordering Father to undergo a psychological evaluation upon pain of fine and/or imprisonment for contempt of court, and because I believe that the trial court erred in placing within the discretion of Child the constitutionally protected interest of Father to visitation, I respectfully dissent.

---

* Former Senior Judge specially assigned to the Superior Court.

We analyze whether, under the circumstances of this case, the trial court could order Father to undergo a psychological evaluation upon pain of fine and/or imprisonment for contempt of court[1] pursuant to Article 1 Section 1 of the Pennsylvania Constitution, which provides:

> **Inherent rights of mankind**    All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.
>
> Pa. Const. Art. 1, § 1.  However:
>
> Although the right to privacy is of constitutional dimension, it is not unqualified.  Privacy claims must be balanced against state interests.  Our test of whether an individual may be compelled to disclose private matters, as we stated it in **Denoncourt [v. Commonwealth State Ethics Commission**, 470 A.2d 945 (Pa. 1983),] is that "government's intrusion into a person's private affairs is constitutionally justified when the government interest is significant and there is no alternate reasonable method of lesser intrusiveness to accomplish the governmental purpose." [**Id**.] at 949.  More recently, we have stated the test in terms of whether there is a compelling state interest.  **Stenger** [**v. Lehigh Valley Hospital Center**, 609 A.2d 796, 802 (Pa. 1992)].  In reality, the two tests are not distinct.  There must be both a compelling, *i.e.*, "significant" state interest and no alternate reasonable method of lesser intrusiveness.

**In re D.S.**, 102 A.3d 486, 489-490 (Pa. Super. 2014) (citing **In re T.R.**, 731 A.2d 1276, 1280 (Pa. 1999) (plurality)).

---

[1] At the conclusion of the subject adjudication hearing, the trial court ordered Father to undergo a psychological evaluation and stated to Father on the record in open court, in part: "Should you fail to follow my instructions, you may be held in contempt.  Contempt in this courtroom is either $1000.00 fine and/or six months in jail.  The choice is yours."  N.T., 7/22/14, at 109.

Instantly, in its opinion pursuant to Pa.R.A.P. 1925(a), the trial court stated that it ordered the psychological evaluation of Father at the outset of the case to "aid in expediting permanency for the Child." Trial Court Opinion, 9/12/14, at 15. Similarly, the trial court in *T.R.*, *supra*, ordered the psychological evaluation of the mother and the release of the results to interested parties so as "to effect the proper placement of the child and to keep families together." *T.R.*, 731 A.2d at 1278.

The *T.R.* Court disagreed with a panel of this Court that the psychological evaluation was the least restrictive means to obtain information about the mother's parenting ability. The Court explained, "where, as here, there is an abundance of information about the ability of the parent to be a parent, there is no state interest, much less a compelling state interest, in the ordering of parental psychological examinations." *T.R.*, 731 A.2d at 1281. Under the circumstances of this case, I find the *T.R.* Court's plurality decision persuasive.

The Majority distinguishes *T.R.* on the basis that the trial court had the benefit in that case of "more than two years' observation of the mother's ability to parent. . . ." Majority Memorandum at 10. In this case, the trial court ordered Father to submit to a psychological examination at the outset of the case, upon adjudicating Child dependent. Thus, the Majority concludes that, unlike *T.R.*, "the record before us does not contain **an**

- 3 -

**abundance of information** about Father's ability to parent Child." *Id.* (emphasis in original). I disagree.

Specifically, the *T.R.* Court noted that DHS in that case correctly argued that, "there was something terribly wrong with the mother's ability to parent." *T.R.*, 731 A.2d at 1281. The Court stated that, "even the department agrees that there is an **abundance of information in the case about whether the children are being cared for properly and whether the mother is a fit parent.**" *Id.* (emphasis added).

Likewise, in this case, I would conclude that there is an abundance of information to demonstrate whether Child is being cared for properly and whether Father is a fit parent. Indeed, the testimonial evidence of record supports the court's dependency adjudication of Child and, further, supports the court's removal of Child from Father's home and commitment to the custody of DHS. Significantly, I note that, similar to this case, the trial court in *T.R.* committed the subject children to the custody of DHS on testimonial evidence independent of the results of the mother's psychological evaluation.

Here, as noted by the Majority, there was testimonial evidence at the shelter care hearing and the dependency hearing involving the deplorable conditions in Father's home and in paternal aunt's home, deemed unfit by the trial court. However, there was also testimonial evidence supporting the

court's conclusion that Child had unaddressed mental health issues. The

trial court explained,

> Specifically, Ms. Williams-Mitchum stated that the Child had been diagnosed with schizophrenia and a psychiatric disorder.[2] Ms. Williams-Mitchum observed first-hand the Child talking to herself extensively and pacing back and forth. Father admitted that he was aware of the fact that the Child talks to herself. When Father was questioned about this, Father stated that he believed that this behavior was normal for a thirteen-year[-]old child who does not have a mother or siblings and is living in a fantasy world. The Court was disturbed by this and was concerned about the Child's unaddressed mental health needs. The Court stated on the record:
>
>> More so, the Court finds to be disturbing, the fact that [Father has] indicated that the child, in his own words, is a motherless child who actually has no other friends to associate with[,] and this is his reason for allowing the fantasy[,] to encourage his child to live in a fantasy. The Court doesn't need to be a mental health advisor to understand that that's incorrect, that's wrong. [. . .] [I]t's obvious [. . .] to the Court, that child needs to be helped to seek mental health attention. [N.T., 7/22/14,] at 102-03.
>
> Furthermore, Father, by his own admission, did not follow-up on setting up an appointment with a doctor for the Child, despite telling the Child's school that he would make an appointment. This raised concerns to the Court about Father's ability to properly address the Child's mental health needs.

Trial Court Opinion, 9/12/14, at 11-12.

Therefore, I conclude that, in this case, there was an abundance of

information about Father's ability to parent Child. Specifically, the evidence

is clear and convincing that Child is dependent and her removal from

---

[2] Pursuant to the shelter care order, Child participated in a psychological evaluation, which occurred prior to the adjudication hearing. Order, 6/26/14; *see also* N.T., 7/22/14, at 18.

Father's custody necessary for her well-being. As such, I believe that the trial court's order requiring Father to undergo a psychological evaluation at the outset of the dependency case, rather than at a later time as in *T.R.*, is a distinction without significance.

For the same reasons, I disagree with the Majority distinguishing *T.R.* based on the trial court's concern about Father's mental health, when nothing suggested that the mother in *T.R.* suffered from diagnosed mental health issues. *See* Trial Court Opinion, 9/12/14, at 13. Like the Majority, I defer to the findings of the trial court regarding Father's mental health that DHS's witnesses were credible and Father's testimony largely incredible.[3] Nevertheless, the record contains an abundance of information that Child is not being cared for properly, and that Father is not a fit parent. *See In re K.D.*, 744 A.2d 760, 761 (Pa. Super. 1999) (concluding that "[a] mere allegation that [the mother] has been taking medication for a mental condition and passed out on one occasion as a result of the medication is

_____

[3] The trial court stated, in part:

> At the adjudicatory hearing, the Court was presented with testimony that Father had received mental health services in the past and was previously hospitalized for mental health treatment. Ms. Williams-Mitchum expressed that she had concerns about Father's mental health based upon her own interactions with Father. Further, Father testified at the adjudicatory hearing, so the Court observed Father first-hand and had concerns about Father's mental health. . . .

Trial Court Opinion, 9/12/14, at 13.

- 6 -

insufficient, in our minds, to force upon her an unwanted psychological evaluation.").

Under the circumstances of this case, I find the reasoning of the *T.R.* Court's plurality decision persuasive, as follows:

> The real issue in the case, then, is not so much whether the children should be removed, as whether the mother should be protected from her own assertion of a constitutional right because the assertion of that right may impede the efforts of the courts to return the children to her care. Citing the legislative goal of keeping the family together, the department would require the psychological examination.
>
> We regard such a concern as well intentioned, but misplaced. Compelling a psychological examination in this context is nothing more or less than social engineering in derogation of constitutional rights, and where, as here, there is an abundance of information about the ability of the parent to be a parent, there is no state interest, much less a compelling state interest, in the ordering of parental psychological examinations. In fact, we find such state intervention frightening in its Orwellian aspect. It is one thing for the mother to agree to psychological evaluation and to voluntarily undergo instruction in self-improvement, but it is quite another for the state, in the exercise of paternalistic might, to order a psychological evaluation in violation of the mother's constitutional rights, presumably upon pain of imprisonment for contempt of court. . . .

*T.R.*, 731 A.2d at 1281. Like in *T.R.*, where the evidence in this case supports Child's commitment to the custody of DHS, I would conclude that, "there is no state interest, much less a compelling state interest," in the ordering of Father's psychological evaluation under risk of fine and/or imprisonment for contempt. *Id.*

With respect to the Majority's concern for the proper placement of Child, the *T.R.* Court next explained,

- 7 -

> The mother, alas, may be her own worst enemy and her shortcomings as a parent may result in the permanent removal of her children; nonetheless, the mother remains a free person, and her power to assert her constitutional right to privacy is not diminished merely because the representatives of the state think it is ill advised.

*Id.*

Indeed, the *T.R.* Court, and subsequent dispositions by this Court, recognized a trial court may consider a parent's refusal to comply with mental health recommendations in determining a child's placement. *See In re J.Y.*, 754 A.2d 5, 9 (Pa. Super. 2000) (concluding that, "*T.R.* stands for the proposition that the court may not, under certain circumstances, invade an individual's privacy rights by ordering a psychological evaluation and revealing its results; however, the court may take into consideration a parent's refusal to follow its treatment recommendation"); *see also D.S., supra* at 491 (citation omitted) (emphasis omitted) (stating that, "there would have been no impediment to the trial court's recommendation that [the f]ather seek treatment, and if [the f]ather opted to forgo that treatment, his refusal could have been considered by the trial court in D.S.'s placement. However, we cannot conclude that there was a compelling state interest in ordering the evaluation and directing [the f]ather to comply with recommendations made by [the mental health evaluator] in this case"). Because the record supports Child's dependency adjudication and her removal from Father's custody, I would reverse that portion of the order

requiring Father to undergo a psychological evaluation upon pain of fine and/or imprisonment for contempt of court.

With respect to Father's final issue regarding whether the trial court erroneously restricted his visitation with Child, the foster care agency caseworker testified that Child has had no visits with Father because Child "has stated to the foster parent that she currently does not want to visit the father at this time." N.T., 7/22/14, at 69. Further, Child has not explained why she does not want to visit with Father. *Id.* As such, I would conclude that the order, in effect, denied Father visitation with Child, and did so improperly as the record is devoid of any evidence that visitation with Father would pose a "grave threat" to Child. *See Lewis v. Lewis*, 414 A.2d 375, 376 (Pa. Super. 1979) (citations omitted) (stating that, "[a] parent is rarely denied the right to visit a legitimate child. Visitation has been limited or denied only where the parent has been shown to suffer from severe mental or moral deficiencies that constitute a grave threat to the child. Visitation has even been allowed to parents whose children do not want to see them").

In rejecting Father's argument, the Majority finds significant that the court's decision to place visitation at Child's discretion is temporary, pending a report from Child's psychologist. Specifically, at the conclusion of the adjudication hearing, the trial court stated on the record in open court as follows:

> The child is order[ed] to continue with her psychological care. I will wait to receive a report from the psychologist whether or not

> . . . it's in the child's best interest to have visitation with dad. Until I receive that report visitation will remain at the child's discretion and then should she decide on visitation they will be therapeutic supervised visits only.

N.T., 7/22/14, at 105-106.

The Majority relies on *In re Damon B.*, 460 A.2d 1196 (Pa. Super. 1983), wherein a panel of this Court affirmed an order temporarily reducing the mother's visitation with her dependent child from twice per month to four times per year. In that case, we noted that the order was "limited in time by the review hearing scheduled within the next seven months." *Id.* at 1198.

In *Damon B.*, we concluded that the "grave threat" standard applied as the goal remained reunification. We further concluded that the trial court erred in reducing visitation even though it found that the mother had no severe mental or moral deficiencies that would constitute a grave threat to the child. However, we stated that, in rare instances, "we have approved restricting or *temporarily* suspending visitation even though there has been no showing of such severe mental or moral deficiencies in the parent as would constitute a grave threat to the child's welfare." *Id.* (emphasis in original) (citations omitted). As such, in *Damon B.*, we affirmed the order based on the testimonial evidence of two clinical psychologists that the visits were counterproductive to the child's development of any bond with his mother, and that the visits created stress for the child, including nightmares, enuresis, irrational fear of his mother, and expressions of rage in the child's

behavior. *See id.* at 1197-1198. We expressly stated that, "our decision is influenced by the fact that this is a temporary reduction in visits rather than a long-term cessation of visits." *Id.* at 1198 n.1.

Similarly, in *In re C.J.*, 729 A.2d 89 (Pa. Super. 1999), this Court was presented with another rare case of an order restricting the parents' visitation that was temporary and the trial court incorrectly applying a "best interest" standard rather than the "grave threat" standard. In that case, we relied, in part, on *Damon B.*, *supra*, in affirming the order of the trial court declining to order visitation at the parents' respective state correctional institutions ("SCI") and ordering visitation to occur once every six months at the Armstrong County prison, when the parents would be transported to the area for dependency review hearings. In *In re C.J.*, we concluded as follows:

> [I]t is clear that, given the two visitation locations available, one of them is unacceptable; extreme stress would occur if the children were to be ordered to visit the parents in their SCI locations, and this would amount to a grave threat to them. There is ample evidence to this effect, as well as a fully supported finding by the trial court. We, therefore, affirm the portion of the order regarding transportation to the parents' SCI locations.
>
> We have before us no finding [by the trial court] under either the "grave threat" or the "best interest" standard regarding visitation in the Armstrong County prison. Nonetheless, there is ample evidence of record for us to find that supervised visitation in that location would not pose a grave threat to the children. . . .

*C.J.*, 729 A.2d at 96.

In stark contrast to **Damon B.** and **C.J.**, in the present case, there is no evidence in the record before us that Father is unfit to associate in a supervised capacity with Child or that there is any severe adverse effect upon Child. Indeed, the trial court made no findings in this regard. Upon a review of the transcript, it appears DHS and the trial court did not have cognizance of the need to consider the constitutionally protected interest of Father to visitation. While it is conceivable that, under the circumstances of this case, visitation with Father may pose a "grave threat" to Child's well-being, DHS failed to introduce any evidence to demonstrate this. Therefore, I disagree with the Majority that **Damon B.**, **supra**, is controlling in this case. As such, I would reverse that part of the order providing for Father to have therapeutic supervised visits at Child's discretion and remand this matter to the trial court to fashion a new order granting Father appropriate visitation pending receipt of a report from Child's psychologist, at which time the trial court could revisit the issue.