J-S10029-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF:  J.S., A MINOR    :    IN THE SUPERIOR COURT OF
                                     :         PENNSYLVANIA
                                     :
                                     :
APPEAL OF:  G.S., FATHER          :        No. 2582 EDA 2014

Appeal from the Order Entered July 22, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-DP-0001440-2014

BEFORE:  GANTMAN, P.J., STABILE, and PLATT,* JJ.

MEMORANDUM BY GANTMAN, P.J.:         **FILED JUNE 22, 2015**

Appellant, G.S. ("Father"), appeals from the order entered in the Philadelphia County Court of Common Pleas, which adjudicated his minor daughter, J.S. ("Child"), dependent and committed her to the Department of Human Services ("DHS").  We affirm.

In its opinion, the trial court fully and correctly set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.  We add only that Father timely filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) on August 13, 2014.

Father raises six issues for our review:

> DID THE COURT ERRONEOUSLY ADJUDICATE CHILD DEPENDENT?

> DID THE COURT ERRONEOUSLY ORDER THAT CHILD BE PLACED?

_____

*Retired Senior Judge assigned to the Superior Court.

DID THE COURT ERRONEOUSLY ORDER THAT DHS MAY CONSENT FOR MEDICATION FOR CHILD WITHOUT [FATHER'S] PERMISSION?

DID THE COURT ERRONEOUSLY FAIL TO ORDER THAT AN INTERSTATE COMPACT OCCUR FORTHWITH?

DID THE COURT ERRONEOUSLY ORDER [FATHER] TO HAVE A PSYCHOLOGICAL OR PSYCHIATRIC EVALUATION?

DID THE COURT ERRONEOUSLY RESTRICT [FATHER'S] VISITATION WITH HIS CHILD, AS TO HER DISCRETION?

(Father's Brief at 2).[1]

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Vincent L. Johnson, we conclude Father's first, second, third, and fourth issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of those issues. (**See** Trial Court Opinion, filed September 12, 2014, at 9-12; 17-18; 19-20) (finding: **(issues 1 and 2)** court heard testimony from several witnesses and carefully considered all evidence presented at adjudicatory hearing; testimony revealed that Father's home was in deplorable condition and was not appropriate for Child; specifically, both DHS social worker and Child Advocate social worker testified that Father's home was extremely dirty, cluttered, and had repugnant odor; one social worker could not even complete her inspection of Father's kitchen because foul odor was so strong; by Father's own admission, there were

---

[1] For purposes of disposition, we have reordered Father's issues.

numerous fruit flies in house and litter box had not been cleaned for some time; additionally, social workers noted flies living in refrigerator among food available for Child to eat; there were also fire hazards in Father's house, as home had no working smoke detectors or fire extinguishers; there was excessive clutter and debris in house, as well as peeling walls and ceilings; Father refused to permit social workers to access third floor of home, in clear violation of court's order to allow DHS to access entire home; based on Father's refusal to let social workers access third floor, whether potentially unsafe or dangerous conditions exist on third floor remains unknown; Father's home has no doors on any rooms in house, which intrudes on Child's privacy; DHS social worker testified that paternal grandmother (who lives with Father and Child) bathes 13-year-old Child, which makes Child uncomfortable;[2] Father said he was unaware paternal grandmother bathes Child; Father's family had previous history with DHS regarding similar allegations of hoarding and deplorable conditions in home; DHS social worker testified that Father's home was inappropriate for Child; court found

---

[2] Father claims the DHS social worker's testimony about paternal grandmother bathing Child constituted inadmissible hearsay. Father did not object to this testimony at the dependency hearing or raise this complaint in his Rule 1925(a)(2)(i) statement, so it is waived. *See In re S.C.B.*, 990 A.2d 762 (Pa.Super. 2010) (explaining that to preserve issue for appellate review, party must make timely and specific objection at appropriate stage of proceedings before trial court; failure to timely object to basic and fundamental error will result in waiver of issue on appeal); *Ramer v. Ramer*, 914 A.2d 894 (Pa.Super. 2006) (stating issues not raised in concise statement of errors complained of on appeal are waived).

testimony of DHS' witnesses credible; court also saw numerous pictures of Father's house in which court could see home was deplorable and looked like burnt-out home; court also heard testimony about Child's unaddressed mental health issues; Child has been diagnosed with schizophrenia; DHS social worker observed Child talking to herself extensively and pacing back and forth; Father stated Child's behavior is "normal" for 13-year-old without mother or siblings; Father admitted he did not follow-up on scheduling appointment for Child's mental health evaluation despite informing Child's school that he would schedule appointment for Child; court was also concerned with Father's mental health, based on DHS social worker's interactions with Father and fact that Father had received mental health services in past and had been hospitalized for mental health treatment;[3] based on totality of evidence, DHS presented clear and convincing evidence that Child lacks proper parental care and control; Child cannot grow and develop properly in Father's home; allowing Child to remain in Father's home would be contrary to Child's health, safety, and welfare; thus, court properly adjudicated Child dependent under 42 Pa.C.S.A. § 6302, and committed her to DHS; **(issue 3)** court had authority under 42 Pa.C.S.A. § 6339(b) to permit DHS to consent to medical care and mental health treatment for

_____

[3] Father contends on appeal that the DHS social worker's testimony about Father's past mental health treatment was based on a lack of foundation and constituted inadmissible hearsay. Father did not raise these claims in his concise statement of errors complained of on appeal, so they are waived. *See id.*

Child; in fashioning order, court sought to ensure Child receives appropriate medical treatment, especially given serious concerns about Child's mental health; **(issue 4)** Child's maternal grandparents reside in Arkansas; court's order adjudicating Child dependent makes clear that DHS must explore inter-state compact for Arkansas forthwith; thus, Father's issue is moot[4]). Accordingly, with respect to Father's first, second, third, and fourth issues on appeal, we affirm on the basis of the trial court's opinion.

In his fifth issue, Father argues the trial court lacked legal authority to compel him to submit to a psychological evaluation. Father relies on *In re T.R.*, 557 Pa. 99, 731 A.2d 1276 (1999) (plurality), which Father claims stands for the proposition that a trial court cannot compel a parent to submit to a psychological evaluation over the parent's objection, based on the particular parent's constitutional right to privacy. Father suggests no genuine distinction exists between the facts in *T.R.* and the facts of this

_____

[4] Father phrased his fourth issue on appeal in his Rule 1925(a)(2)(i) statement as follows: "Did the [c]ourt erroneously refuse that an interstate compact for the child's maternal grandparents should not occur forthwith?" (Father's Rule 1925(a)(2)(i) Statement, filed 8/13/14, at 1). Father's complaint on appeal that the court failed to **expedite** the order for an inter-state compact, and merely ordered DHS to "explore" the inter-state compact, is waived based on Father's vague concise statement. *See In re A.B.*, 63 A.3d 345 (Pa.Super. 2013) (explaining appellant's concise statement must properly specify error to be addressed on appeal; this Court may find waiver where concise statement is too vague to allow trial court to identify issues raised on appeal). Moreover, Father cites no law whatsoever in support of his fourth issue on appeal. *See Glynn v. Glynn*, 789 A.2d 242 (Pa.Super. 2001) (*en banc*) (holding appellant waived issue where he failed to develop it in argument and cited no legal authority to support his claim).

case. Father contends his right to privacy is particularly significant where Child did not come into DHS' care based on allegations concerning Father's mental health. Father submits DHS did not allege Child was improperly cared for, but only that Father chose not to take the advice of Child's school to have Child evaluated for mental health issues. Father insists the DHS social worker's testimony about Father's "tone" is not indicative of a mental health concern. Father declares the trial court's ruling would essentially allow judges to order parents to undergo psychological evaluations early on in dependency proceedings merely because the court has suspicions or arbitrary beliefs that the parent suffers from a mental health issue. Father complains the court's directive expressly contravenes the Supreme Court's holding in **T.R.**, and this Court should reverse the order compelling him to submit to a psychological evaluation. We disagree, under the circumstances of this case.

To begin, in the **T.R.** case, DHS sought a restraining order when T.R. was ten months' old, based on eye injuries T.R. had sustained. T.R.'s parents were unable to explain the injuries. As well, another child in the home had suffered similar eye injuries, resulting in blindness. The court issued a restraining order and continued temporary commitment of T.R., who remained in foster care. One year later, the court adjudicated T.R. dependent, discharged the temporary commitment, and returned T.R. to his mother's custody with DHS supervision. At a dependency review hearing

another year later, evidence showed T.R. had suffered multiple rib fractures while in his mother's care. Four children were in the mother's home, and the mother claimed two of her other children had caused T.R.'s injuries. Following the hearing, the trial court ordered the mother to undergo a psychological evaluation to determine whether she was able to care for her children. The mother objected, but she underwent the evaluation.

Subsequently, the trial court stayed its order requiring release of the results of the psychological examination, to allow the mother to appeal the court's order directing her to submit to the evaluation. This Court affirmed, determining the trial court properly exercised its broad discretionary powers under the Juvenile Act to order the psychological examination. This Court further held, *inter alia*, the trial court's order did not violate the mother's constitutional right to privacy because the information was necessary to carry out the purposes of the Juvenile Act.

On further appeal, the Pennsylvania Supreme Court stated:

> Although the right to privacy is of constitutional dimension, it is not unqualified. Privacy claims must be balanced against state interests. Our test of whether an individual may be compelled to disclose private matters…is that government's intrusion into a person's private affairs is constitutionally justified when the government interest is significant and there is no alternate reasonable method of lesser intrusiveness to accomplish the governmental purpose. More recently, we have stated the test in terms of whether there is a compelling state interest. In reality, the two tests are not distinct. There must be both a compelling, *i.e.*, "significant" state interest and no alternate reasonable method of lesser intrusiveness.

* * *

One's interest in not being forced to disclose such records is significant. The right to protect one's beliefs and thoughts from intrusion by others is…one of the most comprehensive rights known to civilized [persons]. …

Set against this interest of the mother is the interest of the state in discovering enough information about the children and their parents to make intelligent decisions about the placement of the children. [The] Superior Court's view is that the psychological evaluation was the least restrictive means to obtain information about [the mother's] caretaking ability because the other methods of obtaining such information were either limited or failed to provide the necessary information.

* * *

We disagree that means less intrusive were not available. [DHS] argues—correctly—that there was something terribly wrong with the mother's ability to parent. The children continued to be injured even though the department had attempted to assist the mother in caring for her children. Further, the department also points out that its attempts to assist the mother had failed. **In short, even the department agrees that there is an abundance of information in the case about whether the children are being cared for properly and whether the mother is a fit parent.**

*Id.* at 106-08, 731 A.2d at 1280-81 (internal citations and quotation marks omitted) (emphasis added). "[W]here…there is an abundance of information about the ability of the parent to be a parent, there is no state interest, much less a compelling state interest, in the ordering of parental psychological examinations." *Id.* at 108, 731 A.2d at 1281. Therefore, the Supreme Court in *T.R.* reversed the order instructing the mother to submit to a psychological evaluation. *Id. See also In re D.S.*, 102 A.3d 486

(Pa.Super. 2014) (reversing trial court's order directing father to undergo psychiatric evaluation; explaining that, while there remains no absolute bar to ordering psychiatric evaluation, trial court's order was not least invasive means of achieving its goal; concluding there was no compelling state interest in ordering evaluation, **where there were no specific allegations or evidence of record that father had any particular mental health deficiencies**); *In re J.Y.*, 754 A.2d 5 (Pa.Super. 2000), *appeal denied*, 564 Pa. 712, 764 A.2d 1070 (2000) (explaining *T.R.* stands for proposition that court may not, **under certain circumstances**, invade individual's privacy rights by ordering psychological evaluation and revealing its results); *In re K.D.*, 744 A.2d 760, 761 (Pa.Super. 1999) (holding best interests of children could be maintained without compelling mother to submit to psychological evaluation, under circumstances of case; record reveals noticeable lack of support for subjecting mother to psychological evaluation; mere allegation that mother has been taking medication for mental condition and passed out once as result of medication, is insufficient to warrant psychological evaluation).

Instantly, at the conclusion of the dependency hearing, the trial court ordered Father to undergo a psychological evaluation. Although Father relies heavily on *T.R.* to support his position that the court lacked authority to order Father to submit to a psychological evaluation, we recognize *T.R.* is a plurality opinion, which is not precedential. *See In re C.B.*, 861 A.2d 287

(Pa.Super. 2004), *appeal denied*, 582 Pa. 692, 871 A.2d 187 (2005) (explaining decision that does not command majority of votes is non-precedential plurality decision). In any event, the **T.R.** trial court had the benefit of more than two years' observation of the mother's ability to parent, from the time DHS sought a restraining order in April 1992, until the time the court ordered the mother to undergo a psychological evaluation in April 1994. **See T.R., supra**. Here, however, DHS filed the dependency petition on or about June 18, 2014;[5] approximately one month later on July 22, 2014, the court adjudicated Child dependent and ordered Father to submit to a psychological evaluation. The testimony at the shelter care hearing and the dependency hearing focused primarily on the deplorable conditions in Father's home and in paternal aunt's home, which the court deemed unfit for Child. Unlike the facts at issue in **T.R.**, the record before us does not contain **an abundance of information** about Father's ability to parent Child. (**See** Trial Court Opinion at 15) (explaining there is not "abundance of information" known about Father because case just began, in contrast with facts of **T.R.**).

Additionally, nothing in **T.R.** suggested the mother or T.R. suffered from diagnosed mental health issues. **See T.R., supra**. In the present case, DHS representative Tasha Hannah testified at the shelter care hearing

---

[5] DHS received a general protective services report on April 15, 2014, concerning Child's hygiene and potential mental health issues.

that she was concerned about Child's mental health based on her observations of Child. At the conclusion of the shelter care hearing, the court ordered Child to undergo a mental health evaluation. At the dependency hearing on July 22, 2014, the court heard testimony from DHS social worker Tina Williams-Mitchum on the results of Child's mental health evaluation. Ms. Williams-Mitchum reported Child was diagnosed with schizophrenia. Ms. Williams-Mitchum also expressed concerns regarding Father's mental health, based on the flat tone with which Father responded to questions and reports indicating Father had previously received mental health services and was hospitalized for mental health treatment.[6]

During Father's testimony at the dependency hearing, Father stated Child is "gifted," and earned high grades in the A-/B+ range until recently. Father said he was unaware Child had any mental health issues. In response to questions concerning Child talking to herself, Father stated he encouraged Child to be creative and use her imagination. Father believed Child was simply entertaining herself when she talked to herself by acting out plays aloud. Father did not perceive Child's actions as unusual, given Child's mother is deceased and Child has no siblings. When Child's school recommended a psychological evaluation for Child, Father said he would make an appointment for Child with her primary physician and obtain a

---

[6] Ms. Williams-Mitchum did not elaborate on the content of the reports and the reports are not included in the certified record.

referral for a specialist, which Father then failed to do. Father claimed he had no mental health issues which would impede his ability to care for Child.[7] Notwithstanding his testimony, the trial court expressed concerns about Father's mental health. (**See** Trial Court Opinion at 13) (stating: "Further, Father testified at the adjudicatory hearing, so the [c]ourt observed Father first-hand and had concerns about Father's mental health").[8] Thus, **T.R.** is distinguishable from the present case. **Compare T.R, supra**; **In re D.S., supra**; **In re K.D., supra**.

Moreover, the Commonwealth's interest in the proper placement of Child is an important and compelling interest that can outweigh Father's right to privacy. **See Matter of Adoption of Embick**, 506 A.2d 455 (Pa.Super. 1986), *appeal denied*, 513 Pa. 634, 520 A.2d 1385 (1987) (recognizing constitutional analysis involves balancing of competing interests; state's interest in proper placement of children, as well as interest in keeping families intact whenever possible, is important and compelling interest that can outweigh individual's right to privacy). **See also In**

---

[7] The court found the testimony of DHS' witnesses credible; the court found Father's testimony largely incredible. (**See** Trial Court Opinion at 7-8.) **See also In re E.B.**, 898 A.2d 1108 (Pa.Super. 2006) (explaining that on review in dependency cases, this Court affords great weight to trial court because it is in position to observe and rule upon credibility of witnesses and parties who appear before it; this Court will not overrule trial court's findings if they are supported by competent evidence).

[8] The trial court also noted that Child's mother had committed suicide approximately ten years ago. (**See id.** at 1.)

*Interest of Bender*, 531 A.2d 504 (Pa.Super. 1987) (recognizing there are certain instances where statutory privileges must yield to disclosure of communication; where court is concerned with whether child is presently without proper parental care and, if so, whether that care is immediately available, we must hold that injury that would inure to relationship by disclosure of protected communication is not greater than benefit gained for correct disposition of significant issues at play in dependency proceedings).

Based on the lack of evidence of record concerning Father's ability to parent Child, and the testimony at the shelter care and dependency hearings regarding **both** Child and Father's mental health issues, the trial court's order directing Father to submit to a psychological evaluation was the least restrictive means to obtain information about Father's parenting ability under the circumstances of this case. Here, Pennsylvania's interest in providing for the safety and welfare of Child, who has been adjudicated dependent and who has serious mental health issues, outweighs Father's privacy interest under these facts. *See id.*; *Embick, supra*. *See also In re Davis*, 502 Pa. 110, 112, 465 A.2d 614, 620 (1983) (stating: "It should be obvious that in rendering the disposition best suited to the protection and physical, mental and moral welfare of [a dependent] child, the hearing court and the reviewing court **must** take into account **any and all factors** which bear upon the child's welfare and which can aid the court's necessarily imprecise prediction about that child's future well-being") (internal quotation

marks omitted) (emphasis in original). The trial court can certainly review *in camera* the results of Father's psychological evaluation, limit disclosure of the results, and keep the record sealed, to preserve Father's privacy. **See T.R., supra** (Newman, J., dissenting) (suggesting *in camera* review of mother's psychological evaluation and disclosure of results to only parties of interest; by requiring *in camera* review by ultimate arbiter, Commonwealth can achieve its interest in making informed custody placement without disclosure of private information). Thus, Father's fifth issue merits no relief.

In his sixth issue, Father asserts the current goal in this case is reunification, so the court cannot deny him visitation with Child, unless visitation will pose a grave threat to Child. Father acknowledges he was not denied visitation with Child outright, but Father insists the court's order providing for visitation at Child's discretion is tantamount to denying Father visitation. Father contends the court lacked justification for its order. Father submits the court should have let Child testify *in camera* to discern the reasons for Child's decision not to visit with Father, or ordered therapeutic/supervised visits, to address Child's concerns. Father emphasizes Child did not testify at the dependency hearing.[9] Father claims DHS presented no evidence that Father poses a danger to Child. Father

---

[9] The First Home Care caseworker testified that Child did not wish to visit with Father. On appeal, Father claims the caseworker's testimony constituted hearsay. Father did not present this issue in his Rule 1925(a)(2)(i) statement, so it is waived. **See Ramer, supra**.

suggests someone might have coached Child to say she does not want to see Father. Father concludes the court's restriction on Father's visitation with Child was erroneous. We disagree.

In dependency cases, the standard to measure visitation depends on the goal mandated in the family service plan. *In re C.B., supra* at 293. "Where reunification still remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a grave threat. If the goal is no longer reunification of the family, then visitation may be limited or denied if it is in the best interests of the child…." *Id.* (quoting *In re B.G.*, 774 A.2d 757, 760 (Pa.Super. 2001)).

> The "grave threat" standard is met when the evidence clearly shows that a parent is unfit to associate with his…children; the parent can then be denied the right to see them. This standard is satisfied when the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child.

*In re C.B., supra* at 294 (internal citations and some quotation marks omitted). Nevertheless, "[i]n rare instances, we have approved restricting or **temporarily** suspending visitation even though there has been no showing of such severe mental or moral deficiencies in the parent as would constitute a grave threat to the child's welfare." *In re Damon B.*, 460 A.2d 1196, 1198 (Pa.Super. 1983) (emphasis in original) (holding reduction of mother's visitation rights was appropriate, even absent showing of mother's severe mental or moral deficiencies which would constitute grave threat to child's welfare, where visits were counterproductive and child experienced

- 15 -

severe stress during visits; reduction of visitation was temporary and limited in time, where court scheduled review hearing within next seven months).[10]

Instantly, the trial court did not outright deny Father visitation with Child. The court allowed visitation to occur if Child chooses; if Child wants to visit with Father, the trial court ordered supervised/therapeutic visits to occur at DHS. Specifically, the trial court stated at the conclusion of the dependency hearing that it would wait to receive a report from Child's psychologist to decide whether visitation with Father is in Child's best interests. The court temporarily gave Child the choice regarding visitation until the court received and reviewed the report from Child's psychologist. The trial court explained its rationale as follows:

> Here, the Child is thirteen years old and has chosen not to have any visitation with her Father. Although the wishes of a child are not controlling, they certainly constitute an important factor for the [c]ourt to consider in deciding what the appropriate visitation arrangement should be. The [c]ourt will not compel a thirteen-year old child to visit her father if she does not want to, given the circumstances of this case and the absence of any recommendation by a therapist. The [c]ourt referred the Child to obtain mental health treatment so presumably any issues regarding the Child's desire to visit with her Father will be addressed in her treatment. **Indeed, the [c]ourt specifically stated that it wanted to hear from the Child's therapist in a written report regarding visitation with Father.**

---

[10] In **Damon B.**, the trial court improperly applied the "best interest" standard instead of the "grave threat" standard. This Court concluded the best interest standard was inappropriate; nevertheless, this Court explained the trial court's error did not require reversal of the order reducing visitation because the Superior Court can affirm the trial court's ruling on any basis. **See id.**

- 16 -

> **Based on the foregoing, the [c]ourt properly found that visitation with Father was at the Child's discretion at the present time.**

(Trial Court Opinion at 17) (emphasis added).

The trial court did not expressly state it had applied either the "best interest" or the "grave threat" standard. In any event, the court's visitation decision is temporary. The court permitted visitation to occur at Child's choice until the court receives a report from Child's psychologist, at which time the court can make an appropriate decision concerning parent-child visitation. ***See In re Damon B., supra***. Given Child's diagnosis of schizophrenia, Child's present choice not to visit with Father, Father's potential mental health issues, and the temporary nature of the trial court's order of visitation, the order was appropriate.[11] Thus, Father's sixth issue merits no relief. Accordingly, we affirm.

Order affirmed.

Judge Platt joins this memorandum.

Judge Stabile files a concurring and dissenting memorandum.

---

[11] If, after reviewing the report from Child's psychologist, the trial court decides to cease visitation or to continue visitation at Child's discretion on a long-term basis, then the court must apply the grave threat standard. ***See id.*** at 1198 n.1 (stating: "Our decision in this case is influenced by the fact that this is a temporary reduction in visits rather than a long-term cessation of visits. In the latter case, of course, the trial court **must** find, by clear and convincing evidence, that visitation poses a grave threat to the child") (emphasis in original).

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>6/22/2015</u>

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FAMILY COURT DIVISION
JUVENILE BRANCH

| | | |
|---|---|---|
| In The Interest Of: | : | CP-51-DP-0001440-2014 |
| J.S., a Minor | : | FID: 51-FN-0001441-2014 |
| | : | |
| Appeal of G.S., Father | : | 2582 EDA 2014 |
| | : | |
| | : | |

## OPINION

This Opinion is submitted relative to the appeal of G.S. ("Father") from this

Court's Order dated July 22, 2014, which adjudicated his child, J.S., dependent. For the

reasons discussed, this Court respectfully submits that its decision should be affirmed.

## Background

On June 18, 2014, the Department of Human Services ("DHS") filed a

dependency petition as to thirteen-year old J.S. (the "Child") alleging that the Child had

unaddressed mental health issues and that the home was in deplorable conditions. The

petition also alleged that the Child was being neglected by her Father and Paternal

Grandmother, with whom she resided. The Child was attending school dirty and

unkempt. The Child's mother had committed suicide approximately ten years ago and it

was alleged that Father's behavior had not been the same since the Child's mother's

death and that he appeared to be incapable of properly caring for his Child.

An adjudicatory hearing on the dependency petition was scheduled for June 24,

2014. On June 24, 2014, the Court granted Father's request for a continuance of the

adjudicatory hearing. N.T. 6/24/14 at 16. Although Father and Paternal Grandmother

were present for the hearing on June 24, 2014, the Child was not present for the hearing.

The Court was concerned that the Child was not present given the allegations in the dependency petition and despite there being a subpoena issued against Father that required him to bring the Child to the hearing. Id. at 3. When Father was questioned at the hearing on June 24, 2014 about the Child's whereabouts, Father stated that the Child was at his sister's house but that he did not know his sister's address. Id. at 4-5. Eventually, Father's counsel obtained Father's sister's address by calling her on the telephone at the bar of the Court. Id. at 10.

The Court ordered DHS and the Child Advocate Social Worker to go to Father's sister's home that day to assess the Child's safety at that home. Id. at 11. If the Child did not appear safe at Father's sister's home, the Court authorized DHS to obtain an Order of Protective Custody ("OPC") and remove the Child immediately. Id. at 11-12. The Court further ordered DHS and the Child Advocate Social Worker to go to Father's home that day to assess his home. Id. at 12. The Court ordered Father and Paternal Grandmother to cooperate with the home assessment and allow the social workers access to every room in their house. Id. If Father and Paternal Grandmother's home was not safe, the Court authorized DHS to obtain an OPC and take the Child into care. Id. at 13.

After assessing both homes after the hearing on June 24, 2014, DHS found that neither home was appropriate for the Child and an OPC was obtained to remove the Child and place her in foster care. N.T. 6/26/14 at 10. A shelter care hearing was held on June 26, 2014, wherein the Court lifted the OPC and ordered the temporary commitment to DHS to stand.

The adjudicatory hearing was held on July 22, 2014. At the adjudicatory hearing, the Court heard testimony from various witnesses, including the DHS Social Worker on

the case, Tina Williams-Mitchum. Ms. Williams-Mitchum testified that she assessed Father's home after the Court hearing on June 24, 2014. N.T. 7/22/14 at 8. She stated that Father's home was extremely dirty and cluttered and was not appropriate for the Child to reside in. Id. at 10-12, 16. Specifically, Ms. Williams-Mitchum testified that on the first floor of the house, the carpet was matted, the walls and ceiling were peeling, there was debris falling from the ceiling, the kitchen counters were cluttered, and the stove was not operable. Id. at 10-11. There were also gnats in the kitchen and gnats in the refrigerator, and there were cat feces in the kitchen as the litter box needed to be cleaned. Id. at 11. She testified that the house smelled like a "mixture of feces and filth, like matted, as if the home had not been cleaned in some time." Id. at 17, 33, 36. Ms. Williams-Mitchum observed that on the second floor of the house, there was trash throughout the hallway and "[t]here were about three rooms that were cluttered, almost in a pretty much in a hoarded condition with boxes, bottles, papers, all types of miscellaneous items." Id. at 12. She stated that the Child's bedroom on the second floor was not as cluttered as the rest of the house, but that her bed appeared to be broken. Id. at 13. The water did not run out of the sink in the bathroom on the second floor but water did come out of the bath tub at a slow pace. Id. Ms. Williams-Mitchum also stated that the flooring appeared to be unstable throughout the house. Id. at 14. She further testified that Father would not allow her to assess the third floor of the house, despite the Court's order that Father was to allow DHS access to the entire home. Id. at 10, 14, 47.

Ms. Williams-Mitchum also testified that there were no working smoke detectors in the house nor was there a fire extinguisher. Id. at 16-17, 39. The lack of any fire safety equipment concerned Ms. Williams-Mitchum, especially given the excessive

3

clutter and debris in the house. Specifically, Ms. Williams-Mitchum testified under cross-examination:

> Q. Now, clutter in and of itself doesn't create a safety hazard, does it?
>
> A. Yes. The amount of clutter, I don't want to call it hoarding because I can't diagnose it, but I will say hoarding. Their house, there were several rooms of the house that was – that you could not even walk in, and for the home to not have any fire safety equipment. It's a concern with a child living there. Id. at 31.

Ms. Williams-Mitchum also testified that the family had a previous history with DHS regarding similar allegations of hoarding as in the present case. Id. at 27-30. Ms. Williams-Mitchum stated that in her opinion, this showed that the family had a pattern of hoarding. Id. at 30.

Ms. Williams-Mitchum also testified regarding the Child's mental health. She stated that the Child had been diagnosed with schizophrenia and a psychiatric disorder. Id. at 18. Ms. Williams-Mitchum testified that when she met with the Child, she observed the Child talking to herself extensively and pacing back and forth. Id. at 19-20, 27. Specifically, Ms. Williams-Mitchum stated:

> Q. And how long did you observe [the Child] on May 29th?
>
> A. I'm going to say, maybe, twenty to thirty minutes. I'm not sure of the length of time.
>
> Q. You said she was talking to herself and pacing?
>
> A. Correct.
>
> Q. Was that during the entire time you were talking, you were visiting with her?
>
> A. No. There were periods in which I would be in conversation with her and she would look, shift her gaze and then commence to talking to herself.

4

Q. Did you hear anything she was saying?

A. It was audible. I couldn't make out exactly what was being said, no.

Q. Did you ask her about that, why she was doing that?

A. Yes. I said, "Who are you talking to?" She said, "Myself."
So she didn't deny that she was talking to herself. Id. at 41.

Ms. Williams-Mitchum's observations of the Child caused her to have concerns about the Child's mental health so she referred the Child for a psychological evaluation. Id. at 21-22.

There were also allegations that the Child had a chronic lack of hygiene. Id. at 23-24. Ms. Williams-Mitchum stated that the Child told her that her Paternal Grandmother bathes her even though she is thirteen years old. Id. at 42-43. The Child told Ms. Williams-Mitchum that this makes her very upset and that she does not want Paternal Grandmother to bathe her anymore. Id. at 43.

Ms. Williams-Mitchum also testified about Father's mental health. Ms. Williams-Mitchum stated that she had concerns about Father's mental health based on her interactions with Father and the fact that Father had received mental health services in the past. Id. at 45-46. She said that Father was previously hospitalized for mental health treatment. Id. at 46.

Next, Child Advocate Social Worker Keethia Griffiths testified at the adjudicatory hearing. Ms. Griffiths testified that she did a home assessment of Father's home on June 24, 2014 after the Court hearing that day. Id. at 53. Ms. Griffiths took pictures of the home during her assessment, which were marked as "Child Advocate 2"

5

and admitted into evidence without any objection. Id. at 55, 60. Similar to Ms. Williams-Mitchum's testimony, Ms. Griffiths testified that Father's home was very dirty and cluttered. Id. at 57-60, 64-65. She stated that when she walked into the house, there was a smell of mildew and urine and that the smell was the strongest in the kitchen. Id. at 66. Ms. Griffiths said that she could not complete her walk-through of the kitchen because the smell was so strong that she had to walk out of the kitchen. Id. She also said that there were numerous gnats and flies flying out of the kitchen sink. Id. at 58. Ms. Griffiths further testified that the ceiling was falling apart in the house and there was a hole on the front porch. Id. at 56-57. Lastly, Ms. Griffiths stated that all of the rooms in the house did not have any doors. Id. at 58.

Next, Agency Social Worker Shanaya Ford testified at the adjudicatory hearing regarding visitation between Father and Child. Ms. Ford testified that there had been no visits between Father and Child since she was placed in foster care because the Child told her foster parent that she did not want to visit Father at this time. Id. at 69. Ms. Ford said that the Child did not give any explanation as to why she did not want to visit her Father. Id.

Lastly, Father testified at the adjudicatory hearing. Father admitted that there were many objects throughout his home. Id. at 75, 80. Father explained that his house is used as storage by some family members, which causes there to be a lot of items in the house. Id. at 75. He stated "I guess it's why they call it some kind of a hoarding, but it's more or less storage" and "I think I need to have a yard sale and just sell it...." Id. at 75, 80. Father admitted that there were fruit flies in the kitchen and that the litter box in the kitchen had not been emptied. Id. at 76, 84.

Father testified that his Child had been identified as a gifted child but that this past school year, her grades were declining. Id. at 71-72. Father said that he told the Child's school that he was going to take the Child to his family doctor so she could be assessed for any psychological and/or psychiatric needs. Id. at 72-73. However, Father admitted that he never spoke to his family doctor about the Child nor made any appointment for the Child to be tested. Id. at 85-86.

Father denied that the Child ever exhibited any type of behavior which would lead him to believe that she may need mental health treatment. Id. at 78. When questioned about the fact that the Child talks to herself, Father testified:

> Well, ever since she was young I've encouraged her to use her imagination and fantasize. She constantly writes stories and she'll act them out, people talking to each other. She holds little plays for people and she also interjects herself into those situations. You know, just like people do have a fantasy and pretend that she's one of the people of this fantasy. Children do that. Puff the Magic Dragon, for example. Children do that kind of a thing.
>
> And, I talked to her, I said, can you control this? Absolutely. It looks normal to me in the sense that she's a motherless child, doesn't have siblings and she's doing what she has to do to entertain herself. Id. at 77-78.

Father denied that he had any mental health issues that would prevent him from caring for his Child. Id. at 73-74. Father further testified that he was not aware that Paternal Grandmother bathes his thirteen-year old child. Id. at 77, 86. Father also stated that he refused to sign medical consents for the Child to be evaluated. Id. at 83.

At the conclusion of testimony, the Court determined that the testimony of Ms. Williams-Mitchum, Ms. Griffiths, and Ms. Ford were credible. Id. at 100-101. The Court determined that Father's testimony was not credible, with the exception of the fact

7

that he cares for the well-being of his Child. Id. at 101. The Court then found by clear and convincing evidence that the Child was dependent based upon present inability pursuant to 42 Pa.C.S.A. § 6302(1) and committed her to DHS. Id. at 104. The Court further ordered that visits with Father would be at the Child's discretion and that DHS could consent for medical care and mental health treatment for the Child if Father refused to give consent after he is given twenty-four (24) hours notice. Id. at 105, 108-09. The Court further ordered Father to have a psychological evaluation. Id. at 104. This appeal followed.

## Discussion

Father has raised the following seven issues on appeal in his Pa. R.A.P. 1925(b) Statement:

1) Did the Court erroneously find that the child was dependent?

2) Did the Court erroneously find that the child needed to be placed in foster care?

3) Did the Court erroneously find that appellant should be ordered to have a psychological and/or psychiatric evaluation?

4) Did the Court erroneously restrict appellant's visitation to the child's discretion?

5) Did the Court erroneously order that DHS could consent for medication for the child without the appellant's permission?

6) Did the Court erroneously refuse to order that the child be placed in a foster home closer to appellant, in Philadelphia?

7) Did the Court erroneously refuse that an intestate compact for the child's maternal grandparents should not occur forthwith?

8

See Father's 1925(b) Statement, attached as Court Exhibit "A." The Court will address each of Father's issues in turn.

## I. The Court Properly Found that the Child was Dependent and Needed to be Placed in Foster Care.

Issues 1 and 2 are related so the Court will address them together. Father contends that his Child should not have been adjudicated dependent and committed to DHS. Under 42 Pa.C.S. § 6302, a "dependent child" is defined, in relevant part, as one who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals." A finding of dependency must be supported by clear and convincing evidence. In re J.C., 5 A.3d 284, 288 (Pa. Super. 2010). This means "evidence that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." Id. "In the course of conducting this inquiry, the court should of course receive evidence from all interested parties." In re C.M.T., 861 A.2d 348, 356 (Pa. Super. 2004) (citations omitted). Additionally, "the judge should receive, and if necessary should seek out, evidence from objective, disinterested witnesses, e. g., neighbors, teachers, social workers, and psychological experts." Id. "If a child is adjudicated dependent under the Juvenile Act, he or she cannot be separated from his or her parents absent a showing that the separation is clearly necessary." In the Interest of C.P., 836 A.2d 984, 987 (Pa. Super. 2003).

The standard of appellate review which the Pennsylvania Superior Court employs in cases of dependency is as follows:

> [W]e must accept the facts as found by the trial court unless they are not supported by the record...We review for abuse of discretion...[W]e accord great weight to the court's fact-finding

9

> function because the court is in the best position to observe and
> rule on the credibility of the parties and witnesses.

In the Interest of C.M., 882 A.2d 507, 513 (Pa. Super. 2005). Accordingly, the

Superior's Court's scope of review "is of the broadest possible nature." In Re C.J., 729

A.2d 89, 92 (Pa. Super. 1999).

Here, the Court determined that there was clear and convincing evidence that the

Child was dependent under 42 Pa.C.S. § 6302. In making this finding, the Court heard

testimony from several witnesses and carefully considered all of the evidence that was

presented at the adjudicatory hearing. The testimony revealed that Father's home was in

deplorable conditions and was not appropriate for the Child to live in. Specifically, both

the DHS Social Worker and the Child Advocate Social Worker testified that the home

was extremely dirty and cluttered, and had a repugnant odor. Ms. Griffiths even testified

that she could not complete her inspection of the kitchen because the smell was so strong.

By Father's own admission, there were numerous fruit flies in the house and the litter box

had not been cleaned in some time. There were additionally flies living in the refrigerator

among the food that was available for the Child to eat.

There were also fire hazards in the house, as the home had no working smoke

detectors or fire extinguishers and there was excessive clutter and debris in the house, as

well as peeling walls and peeling ceilings. Further, Father refused to allow DHS or the

Child Advocate Social Worker access to the third floor of the house, which was in clear

violation of the Court's Order on June 24, 2014. Since Father did not allow access to the

third floor, it was unknown what other potentially unsafe or dangerous conditions were

on the third floor. There was also testimony that the family had a previous history with

DHS regarding similar allegations of hoarding and deplorable conditions in the home.

10

Moreover, Ms. Williams-Mitchum clearly testified that the home was not appropriate for the Child to live in. N.T. 7/22/14 at 16.

In addition to the testimony from Ms. Williams-Mitchum and Ms. Griffiths, who were both deemed credible by the Court, the Court saw numerous photographs of Father's house that were admitted into evidence without objection. The Court found these photographs significant. In looking at these photographs, the Court could see that the house was deplorable and that it looked like a burnt out home. Id. at 101. The Court found it shocking that a child was living in this house based upon the conditions in the home. The Court determined that a child could not grow and develop properly in this home.

The Court also heard testimony regarding the Child's unaddressed mental health issues in making its determination of dependency. Specifically, Ms. Williams-Mitchum stated that the Child had been diagnosed with schizophrenia and a psychiatric disorder. Ms. Williams-Mitchum observed first-hand the Child talking to herself extensively and pacing back and forth. Father admitted that he was aware of the fact that the Child talks to herself. When Father was questioned about this, Father stated that he believed that this behavior was normal for a thirteen-year old child who does not have a mother or siblings and is living in a fantasy world. The Court was disturbed by this and was concerned about the Child's unaddressed mental health needs. The Court stated on the record:

> More so, the Court finds to be disturbing, the fact that [Father has] indicated that the child, in his own words, is a motherless child who actually has no other friends to associate with and this is his reason for allowing the fantasy to encourage his child to live in a fantasy. The Court doesn't need to be a mental health advisor to understand that that's incorrect, that's wrong. And that it is because the child is motherless and needs to learn her fantasy

11

situations, more, it's obvious to the extent to the Court, that child needs to be helped to seek mental health attention. Id. at 102-03.

Furthermore, Father, by his own admission, did not follow-up on setting up an appointment with a doctor for the Child, despite telling the Child's school that he would make an appointment. This raised concerns to the Court about Father's ability to properly address the Child's mental health needs.

The Court was also concerned about Father's own mental health. Ms. Williams-Mitchum testified that she had concerns about Father's mental health based upon her interactions with Father and the fact that Father had received mental health services in the past. She also stated that Father was previously hospitalized for mental health treatment. The Court also heard ample testimony about Father's hoarding and his lack of compliance with allowing his entire home to be assessed. Father also was not aware that Paternal Grandmother bathes his thirteen-year old Child, and that the Child was very uncomfortable by Paternal Grandmother bathing her. Father was the caregiver for the Child and should have been aware that this was going on in his house. Further, the house had a lack of privacy for the Child, as there was testimony that there were no doors on any of the rooms in the house.

The totality of all of these circumstances compelled the Court to find by clear and convincing evidence that the Child lacked proper parental care and control. The Court further found that allowing the Child to remain in Father's home would be contrary to the Child's health, safety, and welfare. Therefore, the Court properly adjudicated the Child dependent and committed her to DHS.

12

## II. The Court Properly Ordered Father to Have a Psychological Evaluation.

Father next contends that the Court erred when it ordered Father to have a psychological and/or psychiatric evaluation. At the adjudicatory hearing, the Court was presented with testimony that Father had received mental health services in the past and was previously hospitalized for mental health treatment. Ms. Williams-Mitchum expressed that she had concerns about Father's mental health based upon her own interactions with Father. Further, Father testified at the adjudicatory hearing, so the Court observed Father first-hand and had concerns about Father's mental health. The family also had a previous history with DHS regarding similar allegations of hoarding as in the present case. The Court recognizes that hoarding is often times associated with mental health issues.[1]

According to the Pennsylvania Dependency Benchbook, dependency courts are encouraged to "front load" the court process at the beginning of a case. See Administrative Office of Pennsylvania Court's Office of Children and Families in the Courts, Pennsylvania Dependency Benchbook, at §5-6 (2014). Front-loading the court process "is viewed as key to establishing the basis for expedited case processing, ensuring that the family remains involved, and minimizing the time that the child remains in care." Id. One important component of front-loading the court process includes the "assessment of the need for expert examinations or evaluations of the child or *parent's* physical and/or *mental health* and issuance of the appropriate orders." Id. (emphasis added). The Pennsylvania Dependency Benchbook further states: "Early intervention through agency services or family examinations/assessments (i.e., medical, psychological, drug/alcohol, etc.) may aid in expediting permanency." Id. at §5-11. The

---

[1] See http://www.mayoclinic.org/diseases-conditions/hoarding-disorder/basics/definition/con-20031337.

13

Pennsylvania Dependency Benchbook also states that it is a "best practice" of the court to:

> require the agency to collect the medical/psychological history of both the biological parents and the child as early in the process as possible. This information can be helpful in a variety of ways including: assisting the court in decision making, assuring appropriate services are identified, and creating a documented history for the child. Id. at §5-7.

The Court found these guidelines from the Pennsylvania Dependency Benchbook persuasive and used these guidelines in deciding to order Father to undergo a psychological evaluation at the outset of the case.

Father may argue that In re T.R., 731 A.2d 1276 (Pa. 1999), is applicable to present case, but the Court finds that it is distinguishable. In In re T.R., the trial court ordered the mother to undergo a psychological evaluation to determine whether she was able to care for her children. Id. at 1277. The mother objected to the examination. Id. In a plurality opinion, the Pennsylvania Supreme Court found that the mother could not be compelled to undergo a psychological evaluation under the circumstances in that case. Id. at 1281-82. In In re T.R., the underlying allegations against mother were physical abuse of the children by mother and the children continued to be injured even though DHS had attempted to assist the mother in caring for her children. Id. at 1281. The Court in In re T.R. stated, "Compelling a psychological examination in this context is nothing more or less than social engineering in derogation of constitutional rights, and where, as here, there is an abundance of information about the ability of the parent to be a parent, there is no state interest, much less a compelling state interest, in the ordering of parental psychological examinations." Id.

14

Significantly, in In re T.R., the case had been going on for approximately one year before the court ordered that mother undergo a psychological evaluation. Id. at 1277-78. The court in In re T.R. emphasized that at the time that the court ordered the psychological evaluation for mother, there was already "an abundance of information in the case about whether the children are being cared for properly and whether the mother is a fit parent." Id. at 1281. Therefore, the court felt that since there was an abundance of information about the ability of the mother to be a parent, there was not a compelling government interest in the ordering of a parental psychological examination. Id.

In the case at bar, however, the case has just started and there is not an "abundance of information" known about Father at this time, as there was about the mother in In re T.R.. Further, although the court in In re T.R. held that the trial court's order for a parental psychological evaluation was improper, "it did not hold that the privacy interests at issue were absolute." In re J.Y., 754 A.2d 5, 9 (Pa. Super. 2000), citing In re T.R. Furthermore, since In re T.R. was a plurality opinion, it is not binding precedent on this Court. See In Interest of O.A., 717 A.2d 490, 496, fn. 4 (Pa. 1998) ("While the ultimate order of a plurality opinion; i.e. an affirmance or reversal, is binding on the parties in that particular case, legal conclusions and/or reasoning employed by a plurality certainly do not constitute binding authority").

In keeping with the principles set forth in the Pennsylvania Dependency Benchbook, the Court properly determined that ordering Father to undergo a psychological evaluation at the outset of the case would aid in expediting permanency for the Child.

15

**III. The Court Properly Found that Visitation with Father was at the Child's Discretion.**

Father contends that the Court erred when it found visitation with Father was at the Child's discretion. "The Juvenile Act does not contain any guidelines or suggestions for granting or reducing visitation once the child has been adjudicated dependent and removed from his/her natural parents." In the Interest of M.B., 674 A.2d 702, 705, fn. 3 (Pa. Super. 1996). Rather, "[t]he polestar and paramount concern in evaluating parental visitation, in dependency as well as non-dependency situations, is the best interests and welfare of the children." In Re C.J., 729 A.2d at 94; see also In the Interest of M.B., 674 A.2d at 705, citing In Re Long, 459 A.2d 403 (Pa. Super. 1983); In Re E.F.V., 461 A.2d 1263 (Pa. Super. 1983) ("The standard in evaluating frequency of visitation is based on the best interest of the child").[2]

Significantly, the Court did not deny Father visitation with his Child. Rather, the Court ordered that visitation be at the Child's discretion and that if the Child desires to have visits with Father, the visits would be supervised therapeutic visits at the agency. The Court further stated:

> The child is order[ed] to continue with her psychological care. I will wait to receive a report from the psychologist whether or not to find out, whether or not it's in the child's best interest to have visitation with dad. Until I receive that report visitation will remain at the child's discretion and then should she decide on visitation they will be therapeutic supervised visits only. N.T. 7/22/14 at 105-06.

---

[2] In dependency cases, the standard against which visitation is measured also depends upon the goal mandated in the family service plan. In Re C.J., 729 A.2d at 95; In Re B.G., 774 A.2d 757, 760 (Pa. Super. 2001); In Re C.B., 861 A.2d 287, 293 (Pa. Super. 2004). Where reunification still remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a "grave threat" to the child. Id. "If, however, the goal is no longer reunification of the family, then visitation may be limited or denied if it is in the best interests of the child or children." In Re C.J., 729 A.2d at 95.

16

Here, the Child is thirteen years old and has chosen not to have any visitation with her Father. Although the wishes of a child are not controlling, they certainly constitute an important factor for the Court to consider in deciding what the appropriate visitation arrangement should be. The Court will not compel a thirteen-year old child to visit her father if she does not want to, given the circumstances of this case and the absence of any recommendation by a therapist. The Court referred the Child to obtain mental health treatment so presumably any issues regarding the Child's desire to visit with her Father will be addressed in her treatment. Indeed, the Court specifically stated that it wanted to hear from the Child's therapist in a written report regarding visitation with Father. Based on the foregoing, the Court properly found that visitation with Father was at the Child's discretion at the present time.

## IV. The Court Properly Ordered that DHS Could Consent for Medical Care for the Child if Father Refused to Give Consent After Twenty-Four Notice.

Father contends that the Court erroneously ordered that DHS could consent for medication for the Child without his permission.

Pursuant to Section 6339(b) of the Juvenile Act, a juvenile court has authority to order physical and mental examinations and treatment of a child. Section 6339(b) states, in relevant part:

> **Physical and mental examinations and treatment.**--During the pendency of any proceeding the court may order the child to be examined at a suitable place by a physician or psychologist and may also order medical or surgical treatment of a child who is suffering from a serious physical condition or illness which in the opinion of a licensed physician requires prompt treatment, *even if the parent, guardian, or other custodian has not been given notice of a hearing, is not available, or without good cause informs the court of his refusal to consent to the treatment.* 42 Pa. C.S.A. § 6339(b) (emphasis added).

17

Thus, pursuant to 42 Pa. C.S.A. § 6339(b), the Court had authority to order that DHS could consent for medical care and mental health treatment for the Child if Father refused to give consent after he is given twenty-four (24) hours notice. See also In re W.H., 25 A.3d 330, 337 (Pa. Super. 2011) ("[N]otwithstanding Mother's objections, the juvenile court had authority [under 42 Pa. C.S.A. § 6339(b)] to permit [child's] psychiatrist to prescribe medication if the psychiatrist believed that [child's] condition required prompt medical treatment"). In making this order, the Court wanted to ensure that the Child receives the appropriate medical treatment, especially given the serious concerns about the Child's mental health.

## V. The Court Properly Found that the Child Should Remain in her Current Foster Home.

The Child was placed by DHS in a therapeutic foster home in Pottstown, Pennsylvania. Father contends that the Court erroneously refused to order that the Child be placed in a foster home closer to Father in Philadelphia. Although this issue is listed in Father's 1925(b) Statement, the record reflects that at the adjudicatory hearing on July 22, 2014, Father's counsel withdrew his objection to the Child being placed in Pottstown. Specifically, the record states:

> MR. ALLEN: Your Honor, I also ask you to order that the child or at least DHS look for a placement closer to Philadelphia or in Philadelphia.
>
> MS. KAHN: Your Honor, I would actually object –
>
> MR. ALLEN: Right now the child's in Pottstown.
>
> MS. KAHN: And, Your Honor, I would object to that. My client actually seems to be doing fairly well in this home. It's a two parent home. They seem very tuned into her. I think it would be incredibly detrimental to my client to continue to move her. I would ask that she remain where she is at this time.

18

MR. ALLEN: Your Honor, she –

MS. ITALIANO: And we concur.

MR. ALLEN: Your Honor, she's only been there a short period of time.

THE COURT: No.

MR. ALLEN: *Okay. That's fine, Your Honor. My client does not object to that. I'm sorry.* N.T. 7/22/14 at 106-07 (emphasis added).

Since Father did not object to the Child remaining in Pottstown at the adjudicatory hearing, this issue is waived. See Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal"); Brown v. Philadelphia Tribune Co. 668 A.2d 159, 162 (Pa. Super. 1995) ("It is clear under Pennsylvania law that issues not raised below are waived on appeal...[A]n appellant must make a timely, specific objection at trial...in order to properly preserve an issue for appeal").

Even if the issue is not waived, there was competent testimony on the record that the Child has adjusted well in the foster home and that there were no concerns with the foster home itself. N.T. 7/22/14 at 17-18. Therefore, the Court properly allowed the Child to remain in her current therapeutic foster home.

## VI. The Court Ordered that DHS Explore an Intestate Compact for the Child's Maternal Grandparents Forthwith.

Father's final issue can be easily disposed of. Father contends that the Court refused to allow that an interstate compact be done forthwith with the Child's maternal grandparents who live in Arkansas. However, the Court's Order dated July 22, 2014

19

clearly states: "DHS TO EXPLORE THE INTER-STATE COMPACT FOR ARKANSAS FORTHWITH." Therefore, Father's seventh issue is moot.

## Conclusion

For the foregoing reasons, the Court respectfully submits that its decision be affirmed.

BY THE COURT,

VINCENT L. JOHNSON, J.

Dated: September 12, 2014

20

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FAMILY COURT DIVISION**
**JUVENILE BRANCH**

In The Interest Of:                  :        CP-51-DP-0001440-2014
J.S., a Minor                        :        FID: 51-FN-0001441-2014
                                     :
Appeal of G.S., Father               :        2582 EDA 2014
                                     :

### PROOF OF SERVICE

I hereby certify that I am this 12th day of September, 2014, serving the foregoing Opinion on the persons indicated below, by first class mail:

Theresa Italiano, Esquire                    Counsel for DHS
Assistant City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 16th Floor
Philadelphia, PA 19102

Reginald Allen, Esquire                      Counsel for Appellant/Father
7601 Crittenden Street
Unit F12
Philadelphia, PA 19118

Beth Kahn, Esquire                           Counsel for Child
Defender Association of Philadelphia
Child Advocacy Unit
1441 Sansom Street, 9th Floor
Philadelphia, PA 19102

_Colleen Nicholas_
Colleen Nicholas, Esquire
Law Clerk to the Honorable
Vincent L. Johnson

Court Exhibit "A"

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FAMILY COURT DIVISION
JUVENILLE BRANCH

IN RE: J.S.

: DOCKET NO. CP-51-DP-0001440-2014
: FID: 51-FN-001441-2014

## APPELLANT'S STATEMENT OF ISSUES PRESENTED ON APPEAL

1. Did the Court erroneously find that the child was dependent?

   Answered in the negative by the Court.

2. Did the Court erroneously find that the child needed to be placed in foster care?

   Answered in the negative by the Court.

3. Did the Court erroneously find that appellant should be ordered to have a psychological and/or psychiatric evaluation?

   Answered in the negative by the Court.

4. Did the Court erroneously restrict appellant's visitation to the child's discretion?

   Answered in the negative by the Court.

5. Did the Court erroneously order that DHS could consent for medication for the child without the appellant's permission?

   Answered in the negative by the Court.

6. Did the Court erroneously refuse to order that the child be placed in a foster home closer to appellant, in Philadelphia?

   Answered in the negative by the Court.

7. Did the Court erroneously refuse that an interstate compact for the child's maternal grandparents should not occur forthwith?

   Answered in the negative by the Court.

REGINALD ALLEN, ESQUIRE